**TENNESSEE PRODUCTS & CHEMICAL CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BASHAM COAL COMPANY et al., Respondents.**

Nos. 18357, 18463.

United States Court of Appeals, Sixth Circuit.

March 5, 1970.

George A. Burnstein, Philadelphia, Pa., Joseph L. Halberstein, Marion, Ohio, on brief; Kleinard, Bell & Brecker, Philadelphia, Pa., Halberstein & Mitchell, Marion, Ohio, of counsel, for petitioner Tennessee Products & Chemical Corporation.

William M. Ables, Jr., South Pittsburg, Tenn., W. D. Spears, Spears, Moore, Rebman & Williams, Chattanooga, Tenn., on brief, for respondents, except Cardell Coal Co. and Tennessee Products Co.

Vivian Asplund, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Allison W. Brown, Jr., Attys., N. L. R. B., Washington, D. C., on brief, for National Labor Relations Board.

John B. Rayson, Knoxville, Tenn., Edward L. Carey, Willard P. Owens, Washington, D. C., E. H. Rayson, Knoxville, Tenn., on brief, for Intervenor United Mine Workers of America.

Before O'SULLIVAN, EDWARDS and PECK, Circuit Judges.

O'SULLIVAN, Circuit Judge.

In No. 18,357, Tennessee Products & Chemical Corporation seeks review, and in No. 18,463 the National Labor Relations Board seeks enforcement of, a decision of the National Labor Relations Board whereby petitioner, Tennessee Products and respondents Basham Coal Company, et al., were found guilty of violating Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (5), by refusing to bargain with the United Mine Workers of America through the agency of a multi-employer unit constructed by order of the NLRB. In addition, respondents H. Willis Flynn, d/b/a Poplar Coal Company (Poplar), and Sycamore Coal Company (Sycamore), were found guilty of violating Section 8(a) (2) of the Act, 29 U.S.C. § 158(a) (2), by entering into contracts with the Southern Labor Union which had not been certified as the bargaining agent of their employees. The opinion and order of the Board is No. 12 in Volume 167 NLRB.

We deny enforcement of the Board's order.

*Alleged violations of Sections 8(a) (1) and (5).*

I.

Recital of the facts and the prior proceedings is necessary because of the unusual nature of this case. It grows out of the labor strife that has so long beset southeastern Tennessee coal lands. Prior to 1962, Tennessee Products and Chemical Corporation (Tennessee Products) and Tennessee Consolidated Coal Company (Tennessee Consolidated) were the dominant interests in the area here involved; both had actively operated coal mines and leased portions of coal lands controlled by them to independent operators.

Tennessee Products and Tennessee Consolidated, with other mine operators in the area, had, prior to 1962, bargained with the United Mine Workers through an organization known as the Southern Tennessee Coal Producers Association. The contract negotiated by this association in 1958 expired in October, 1962. In September of 1962, various operators in the area formed the Sewanee Coal Operators Association, Inc. (Sewanee). Sewanee's charter stated that it was incorporated for a purpose, among others, of acting as the exclusive bargaining agent for its members. Neither Tennessee Products, Grundy Mining Company, nor Tennessee Consolidated became formal members of Sewanee. Instead they made application for membership subject to the condition that Sewanee not negotiate for them unless and until the UMW had been duly certified as bargaining agent for their employees.

Negotiations between Sewanee and the UMW commenced in September, 1962. Between September and December, 1962, there were four bargaining sessions between UMW and the Sewanee group. We draw a justified inference that the

only contract that the United Mine Workers could consider was the National Bituminous Wage Agreement of 1950, as amended by the Price Wage Clause of 1958. This was the contract that had been made between the Bituminous Coal Operators Association, an association of the operators of the big mechanized mines in Tennessee, and the United Mine Workers. This contract was the subject of several suits against the Mine Workers charging violation of the Sherman Act. See Ramsey v. United Mine Workers, 265 F.Supp. 388 (D.C.E.D.Tenn. 1967) affirmed 416 F.2d 655 (6th Cir. 1969); and Tenn. Consolidated Coal Co. et al. v. United Mine Workers, 416 F.2d 1192 (6th Cir. 1969).

The negotiations between the Sewanee group and the UMW were fruitless; and on December 26, 1962, the Mine Workers called a strike throughout the involved coal fields. The mines of all the respondents, as well as those of Tennessee Products, were shut down. Most of these mine enterprises have gone out of business.

## II.

In February, 1963, following the start of the strike, United Mine Workers filed a petition with the Regional Director to have that union certified as the bargaining representative of the employees of all the members of Sewanee Coal Operators Association as well as the employees of Tennessee Products and Grundy Mining Company, all of which employers to be required to bargain with the UMW as a single multi-employer unit. Success in this endeavor would give the UMW exclusive bargaining rights for the employees of some forty-three different mine operators, regardless of the wishes of a majority of the employees of any single enterprise. On May 23 and June 6, 1963, the Southern Labor Union (SLU) filed with the Board petitions seeking elections in separate and single-employer units consisting of the employees of Grundy Mining Company, Stephenson Brothers Coal Company, Inc., and M. A. Payne, Inc. Grundy Mining

was the largest single employer involved. The Sewanee Association requested that bargaining agents for employees of each of its members be determined by election in individual employer units. Grundy Mining Company requested that it be considered a separate unit for any certification election. It is clear, therefore, that at the time the Board first considered the propriety of constructing a multi-employer unit, it was fully aware that every employer involved was opposed to it. It knew also that a union competing with the UMW was asserting that it represented a majority of the employees of three separate employers. The Board's own decision asserts its awareness of these facts.

The Board's decision also discloses its recognition that law and its own policy required that *intent* by the involved employers to form such a multi-employer unit was essential to its creation. The Board said:

"The test is whether the *employer parties* have manifested *an intent* to be bound by group rather than individual action." (Emphasis supplied.)

The Board, on September 30, 1963, ordered that an election be held among the employees of all of the mine operators here involved, tied together into a single multi-employer unit. The Board's asserted justification for this resides in the fact that in earlier years there had been some multi-employer bargaining and the shortlived effort by mine operators to deal with the UMW through the Sewanee Association.

It is the Board's position that no new *intent* could be arrived at after the strike had commenced. Thus, the Board reasoned:

"The bargaining history also reflects that the intent on the part of the companies to bargain on a multi-employer basis *is a continuing one.*" (emphasis added)

This conclusion was expressed notwithstanding the Board's knowledge that, following the start of the strike and the UMW's intransigent insistence that only

its then standard contract would be accepted, all of the operators involved repudiated such multi-employer bargaining.

Pursuant to the Board's order of September 30, an election was held on October 15, 1963. Canvass of the voting disclosed that 579 ballots were cast, of which 108 were for UMW, 50 for the Southern Labor Union, and 421 ballots were challenged. Prior to the election there were only 280 employees of employers in the Sewanee Association listed as eligible to vote and Grundy had listed 155 of its employees as eligible to vote. It is clear that the number of votes cast substantially exceeded the total listed as eligible to do so. While the record is silent on the matter it may be that some, or all, of the mine operators who had gone out of business after the December 26, 1962, strike did not send in eligibility lists, but their former employees voted nevertheless.

Prior to the Board's decision of September 30, and the election of October 15, the Grundy Mining Company which had been the biggest operator prior to the strike, attempted to resume operations employing members of the Southern Labor Union. These employees attempted to organize a local union made up of members of the Southern Labor Union working for Grundy. Such activities brought on spectacular violence and terrorism by members of the UMW. This violence was described in, and was the subject of, two decisions of the Board finding the UMW guilty of such conduct. See United Mine Workers Local No. 7083 (Grundy Mining Company) and Southern Labor Union, 146 NLRB 176 (1964), and United Mine Workers of America, Local No. 7244 (Grundy Mining Company) and Southern Labor Union, 146 NLRB 244 (1954).

After the report of the election, Grundy and SLU filed timely objections with the Regional Director charging that the conduct of the Mine Workers had made a fair election impossible. The Regional Director, sustaining objections in such regard, found that the previous violence of the UMW and the conditions that surrounded the voting area on the day of the election prevented a free choice by the voters. He said:

"However, in the opinion of the undersigned, the pictorial evidence submitted during the investigation depicting the crowd massed at the entrance to the polling place and the placard electioneering by unidentified persons in behalf of the UMW in the area immediately outside the polls and in close proximity to the voters waiting in line coupled with the background of violence hereinbefore described was sufficient to create an atmosphere of fear and confusion at the polls which raises substantial and material issues regarding the results of the election."

After the foregoing, and other recitals, the Regional Director recommended that:

"For this reason, the election should be set aside and a new election directed, subsequent to the hearing hereinafter recommended."

The hearing thereafter recommended by the Regional Director was "to resolve the issue raised by the 421 challenged ballots." His recommendations also contain the recital that the "Board agent challenged 379 persons whose names were not on the eligibility list furnished by the employer" and further set out that,

"As a result of the strike, certain members of Sewanee ceased operations either temporarily or permanently, whereas others continued operations. As a result the persons who voted in the election consisted of working employees, strikers, replacements and laid off employees."

His recommendations reported that the Sewanee Association had contended that only 11 of its former members "intend to remain in business" and that some 21 of the involved former mine operators had "permanently ceased operations prior to the elections" but that their former employees nevertheless voted at the election.

These considerations led, then, to his recommendation that,

"a hearing before a Trial Examiner of of the Board be directed to resolve the issues raised by the 421 challenged ballots herein."

The foregoing Report and Recommendations of the Regional Director were filed on December 17, 1963. Thereafter, on December 23, 1963, Sewanee, apparently assuming that a new election would be held, as recommended by the Regional Director, requested that the Board "spell out the names of the coal companies in business whose employees were entitled to vote as members of Sewanee."

On April 28, 1964, the Board issued a supplemental Decision and Order, reported as Sewanee Coal Operators Association, Inc., 146 NLRB 1145 (1964) in which it refused to follow the Regional Director's recommendation that the election be set aside. The Board thought that the April and May, 1963, mob threats and violence of which it convicted the UMW "could have no substantial impact on voter free choice in the election." The Regional Director's report stated that during the election,

"a large number of persons, including strikers, nonstrikers, replacements and others congregated on the sidewalk and stood immediately outside the polling place before and during the polling period."

and that,

"the crowd was estimated to number from 200 to 2000 at various times, with a line of voters four to six feet deep extending from the polling place down the sidewalk for a block or more. While the polls were opened, several unidentified persons circulated about the voting line outside the polling place wearing placards reading 'VOTE FOR UNITED MINE WORKERS AND BE ABLE TO GET A PENSION.' "

Disagreeing with the Regional Director, the Board said:

"The Regional Director based his finding concerning crowding upon pictorial evidence submitted during investigation. However, he does not point to any specific incidents of disorderliness or coercive conduct but merely couples the evidence of electioneering and crowding immediately outside the polling place with the much earlier incidents of strike violence which we have found to be too remote to have an effect upon the election."

Disposing of all of the employer objections to the report of the election, the Board concluded,

"In view of the foregoing, we hereby overrule the objections in their entirety."

Thereafter, on May 11, 1964, Grundy Mining filed a petition for reconsideration and motion to reopen the record. Once again it requested the Board to determine the bargaining agent of its employees independently of all other employers and to consider further misconduct of the UMW occurring after the election of October 15, 1963. This motion was denied by the Board's order of June 11, 1964, which order, however, expanded the matters to be considered at the hearing which had been initially set up to consider only the 421 challenged ballots:

"IT IS FURTHER ORDERED that, to the extent that the facts alleged may affect the disposition of the challenges, or to the extent that alleged events occurring after the election relate to changes in the composition, *or the continued existence of, the unit found appropriate,* the scope of the hearing set for June 16, 1964, is broadened to permit the introduction of such evidence." (Emphasis supplied.)

Thus, the propriety of putting into one multi-employer unit all of the involved mine operators was reopened in June of 1964 for reconsideration in the light of events occurring after the election. This hearing commenced on June 16, 1964, before Trial Examiner Fannie M. Boyls. Prior to that date the Sewanee Coal Operators Association had formalized its position that it was not in existence as a multi-employer group by surrendering its

charter to the State of Tennessee and terminating its corporate existence.[1]

At the June, 1964, hearing it was again made clear that all of the mine operators who would be affected by being included in a multi-employer unit were opposed to it. Petitioner Tennessee Products had early advised that it had ceased all mining operations and would not reenter the business. Grundy Mining Company expressed its desire to carry on its operations with members of the Southern Labor Union. The Board knew of the violence wrought upon Grundy by the UMW for Grundy's attempt to so operate and had properly denounced it in earlier decisions. Such was the situation when the hearing commenced before Trial Examiner Boyls on June 16, 1964. The testimony taken confirmed and corroborated employers' opposition to a multi-employer unit by every employer concerned. While there is some confusion as to whether the respondents had so stipulated, the Board found that a majority of the votes cast at the October 15, 1963, election were for the UMW. There is no way of telling how the employees of any single employer voted. We need not further consider the matter of the 421 challenged ballots.

The Southern Labor Union, obviously speaking for employees of Grundy, opposed being included in such a unit. The testimony showed that the majority of the onetime members of Sewanee went completely out of business following the strike of December 26, 1962, and at the time of hearing had no prospects of returning. At most, only 12 companies, originally considered as members of the appropriate unit by the Board, evidenced any intent to continue, or resume, mining operations. That the trial examiner knew all of this is exhibited by various observations, such as:

"The fact that many of them [formerly members of the then defunct Sewanee]

because of heavy financial losses suffered during the strike or because the mines which they had been operating are no longer operative, expressed the view that they will not be financially able to resume their business as operators if and when the strike is settled, does not, in my view, warrant a finding that the multi-employer unit no longer exists or is inappropriate."

Further, she said:

"Accordingly, despite the testimony of some of the operators that they have no present intention of hesuming the no present intention of resuming the business of operating coal mines, I am convinced that some of those so testfying will find the means of again opening their old mines or other mines in that area, and that they will continue to feel the need of collective strength in bargaining with the representative of their employees as they did when they joined Sewanee."

Trial Examiner Boyls made specific findings that some nine former members of Sewanee went out of business because their leases had been cancelled, and set out that some thirteen others were clearly out of business without prospects of reentering. But the examiner concluded the matter by stating:

"The multiemployer bargaining unit heretofore found by the Board to be appropriate was described in the Decision and Direction of Election as comprising the production and maintenance employees of all members of Sewanee, but in view of the fact that Sewanee in its corporate form has dissolved since the UMW won the election, the multi-employer unit is now more accurately described as comprising the production and maintenance employees of those coal mining operators who were formerly members of Sewanee. It is accordingly recommended that the

1. The Resolution to dissolve contained a paragraph reading:

"WHEREAS, there remains only four (4) companies of said Association who have not received cancellation, being Thomas Coal Co., Leon Nunley Coal Co., Marshall Meeks Coal Co., and Easy Coal Co., all others having been cancelled; and it further appearing that the entire purpose of said Association had been voided * * *."

Board certify the UMW as the collective bargaining representative of all the production and maintenance employees of coal mining operators who were formerly members of Sewanee, including those who are not now operating but who resume the business of operating coal mines at the end of the strike or before the conclusion of the strike."

Her decision came down on September 29, 1964, (reported as Sewanee Coal Operators Association, Inc., 152 NLRB 663). The Board affirmed this decision on May 17, 1965, expressing its view that the appropriate unit included not only former members of Sewanee Coal Operators Association who were still in business, but also,

"those not now operating but who resume operating old mines either before *or after* the conclusion of the strike, and *including also those individuals who had sole or controlling interest in a corporation which was a member of Sewanee Coal Operators Association who form another corporation and operate a new or different mine on the geographic area here involved."* (Emphasis supplied.)

A certification consistent with the May 17 decision was issued on June 7, 1965. The UMW, in July, 1965, made a demand upon all the respondents and Tennessee Products to bargain with them. No response was made to these demands and on November 1, 1965, charges of refusal to bargain were filed by UMW. Amended charges were filed in March of 1966, and on April 8, 1966, the complaint here involved was issued. Hearing on this complaint was had in September of 1966 and a decision of a trial examiner finding all respondents and petitioner Tennessee Products guilty of violations of Section 8(a)(1) and (5) of the Act came down on March 28, 1967. The Decision and Order of the Board affirming its Trial Examiner came down on August 22, 1967. The Trial Examiner's recommended order, adopted by the Board, commanded that some 43 concerns, ex-

cluding as an entity the defunct corporate association Sewanee.

"Take the following affirmative action which it is found will *effectuate the policies of the Act:*

"(a)  Upon request, bargain collectively with United Mine Workers of America as the exclusive bargaining representative of employees in the appropriate unit set forth hereinabove, jointly together with the other Respondents (except Sewanee and New Floyd), or together with other persons within the description of the appropriate unit, or separately, as may be mutually agreed upon between the Respondents, or any of them, and the UMW, for a reasonable period, but not less than 12 months, and if an agreement is reached, embody such understanding in a signed agreement." (emphasis supplied)

### III.

The above Decision and Order of August 22, 1967, entered just under five years after commencement of the strike, presented the first opportunity for any employer to obtain judicial review of its inclusion in the multi-employer group. Presumably there has been no bargaining between such a multi-employer unit and the United Mine Workers since the strike of December 26, 1962. We read the end product of the long procedure herein reviewed as a command by the NLRB that no enterprise which, at the beginning of the UMW strike of December 26, 1962, was a member of or had authorized the Sewanee Association to bargain for it, shall ever again mine coal in the State of Tennessee without first bargaining with the United Mine Workers.

We are not persuaded that a mining operation whether carried on as a sole proprietorship, as a member of a partnership, or in corporate form, and whose business was destroyed by the strike and such operator's inability to meet the terms of the UMW proffered contract should be closed out of ever re-entering

the mining business except on the UMW terms.

We have had numerous occasions to consider the great power of the United Mine Workers in the coal fields of Tennessee. This power was greatly enhanced by the dealings between the UMW and the big mining companies acting together as the Bituminous Coal Operators Association. Wholly apart from whether the UMW illegally conspired with the BCOA, it was the aim and purpose of the UMW to require that anyone attempting to mine coal in southeastern Tennessee do so only by signing and living up to the terms of the National Bituminous Coal Wage Agreement of 1950 as supplemented by the 1958 Protective Wage Clause. Paragraph A of this Wage Clause provided:

"A. During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor will it permit any agreement or understanding covering any wages, hours or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto."

In the case of Tennessee Consolidated Coal, et al. v. United Mine Workers, 416 F.2d 1192 (6th Cir. 1969), recently announced by this Court, and dealing with the Mine Workers seeking complete control of mining in southeastern Tennessee, Judge Weick observed:

"The record contains an admission by counsel for UMW that the PWC [the Price Wage Clause contained in the contract between UMW and the Bituminous Coal Operators Association] was a 'quid pro quo.' Paragraph A was demanded by BCOA. Paragraph B, containing the promise of the signatory operators, was demanded by UMW.

In this paragraph the operators agreed to boycott coal not produced in conformity with the national agreement. UMW faithfully complied with Paragraph A in all collective bargaining agreements which it entered into. UMW struck operators who refused to agree to the national contract. The record in *Ramsey* is replete with evidence of mass picketing, force and violence." 416 F.2d at 1198.

The *Ramsey* case referred to in this quotation is reported as Ramsey v. United Mine Workers, 265 F.Supp. 388 (E.D. Tenn. 1967), aff'd en banc by equal division of this Court in Ramsey et al. v. United Mine Workers, 416 F.2d 655 (6th Cir. 1969). That case covered substantially the same period of the violent history of coal mining in southeastern Tennessee. Concerning this period, Judge Wilson said:

"In the period since 1960 the coal operators in the Southeastern Tennessee coal field have been unable to compete and survive in the T.V.A. coal market under the National Bituminous Coal Wage Agreement. While in many instances this appears to have been due to antiquated mining methods and equipment or other causes, the fact nevertheless remains that since 1960 there has not been a single instance of a successful coal mining operation in the Southeastern Tennessee coal field under the National Bituminous Coal Wage Agreement and this in spite of the fact that the *only feasible alternative facing most coal operators in the area was to operate under the national contract or go out of business.*" 265 F.Supp. at 430. (Emphasis supplied.)

From a reading of the record here and from other cases such as Gibbs v. United Mine Workers of America, 343 F.2d 609 (6th Cir. 1965), reversed, Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), it is clear that the only labor organization that attempted to compete with the Mine Workers was the Southern Labor Union. The few mine operators who tried to operate without signing the Uniform National Bitu-

minous Coal Wage Agreement of 1950 with the Protective Wage Clause of 1958, tried to do so without union men or with members of the Southern Labor Union. The grave and spectacular violence that attended these efforts is set out with particularity in United Mine Workers of America v. Local No. 7083, (Grundy Mining Company) and Southern Labor Union, 146 NLRB 176 (1964), United Mine Workers of America, Local No. 7244, (Grundy Mining Company) and Southern Labor Union, 146 NLRB 244 (1964). In both of these cases the United Mine Workers were convicted of the violence charged.

Grundy Mining did attempt to operate independently of, and during, the hegemony of the UMW. One Paul Gibbs who had attempted to open a mine, using members of the SLU as his employees, was the object of violence employed by members of the United Mine Workers in the case Gibbs v. United Mine Workers of America, 220 F.Supp. 871 (E.D. Tenn. 1963). On review, our affirmance of the *Gibbs* decision was reversed upon a holding that there was not *clear proof* that the UMW, as an entity, was responsible for the violent depredations of its members. Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130. In *Ramsey*, District Judge Wilson described the events that followed the strike here involved and which is claimed to be still in progress.

"With respect to the strike which occurred on December 26, 1962, and which has been in effect since that date, the evidence is clear * * * that the strike has been accompanied by much mass picketing, violence and property destruction. Both sides in the dispute have suffered the effects of such violence, but the operators and those miners who sought to cross the picket lines have suffered much the worse of the violence. Without attempting to itemize the record, it may be said that homes were shot into, burned or dynamited by unidentified assailants. Coal was dumped upon the highway. Trucks and cars were fired upon numerous times. Power poles and mine equipment were dynamited. Coal tipples were burned and mine guards were fired upon. Operators were forced to abandon their mines and equipment for reasons of personal safety, with the mines and equipment suffering heavy losses from mine flooding and vandalism. Several men were killed. One intrepid operator was the intended victim of dynamite thrown into his yard from a speeding car, but he seized the lethal bundle and removed the cap just seconds before it went off. While it certainly adds no luster to the occasion, there were victims to violence upon both sides. The home of the U.M. W. District Representative was damaged by dynamite. Four local union halls were burned. Union men were shot at and union homes were burned." 265 F.Supp. at 429.

## IV.

The law is clear that it is within the Board's power to put together a so-called multi-employer group and certify the union which will be the exclusive bargaining agent for the employees of all the employers within the multi-employer group. In NLRB v. Truck Drivers' Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed. 2d 676 (1957), the Supreme Court said:

"[T]he compelling conclusion is that Congress intended 'that the Board should continue its established administrative practice of certifying multi-employer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future.'" 353 U.S. at 96, 77 S.Ct. at 647.

The power of the Board to order multi-employer bargaining does not derive from statutory enactment. Instead, it is permitted as an instrument of the National Labor Board's policy and duty—the promotion of industrial peace through effective bargaining. The validity of the Board's exercise of power in any given circumstance depends, then, upon whether it will effectuate the purposes of the Act.

In this case the Board's determinations and orders have led to neither effective bargaining nor industrial peace; neither, in our view, were they calculated to serve these ends. The Board's attempt to sanction the creation and perpetuation of a UMW hegemony in southeastern Tennessee, therefore, cannot stand unquestioned.

■ The multi-employer unit is a creature based, at its inception, on consent of employees *and* their employers. NLRB v. Local 210, International Bhd. of Teamsters, 330 F.2d 46, 12 A.L.R.3d 800 (2nd Cir. 1964). In NLRB v. Sklar, 316 F.2d 145 (6th Cir. 1963), we said:

> "Membership of an employer in a multi-employer unit is wholly voluntary. The unit can only be created with the consent of the employers. The Board may not force any employer to join a multi-employer unit or prevent him from exercising his right to withdraw therefrom at an appropriate time. The fact that MAD had been a member of a multi-employer unit did not consign it to that status forever. The Board has recognized that an employer may withdraw from the multi-employer unit provided that it clearly evinces at an appropriate time its intentions of pursuing an individual course in bargaining." 316 F.2d at 150.

In Universal Insulation v. NLRB, 361 F. 2d 406 (6th Cir. 1967), we held that under the special *facts of that case* one employer's attempt to withdraw from a multi-employer unit, after that unit had begun bargaining and had arrived at a contract with a union, was untimely. We there referred to several NLRB cases and NLRB v. Sheridan Creations, Inc., 357 F.2d 245 (2nd Cir. 1966) which appeared to announce a *per se* rule that an employer's withdrawal is untimely after bargaining has begun except on mutual consent. The Board relies on our decision in *Insulation* and that of the Second Circuit in *Sheridan*. However, the Second Circuit in NLRB v. Spun-Jee Corporation, 385 F.2d 379 (2nd Cir. 1967) made clear that the *per se* rule of *Sheridan* would yield to *unusual circumstances*. Such is the view of the Tenth Circuit, see NLRB v. Tulsa Sheet Metal Works, Inc., 367 F.2d 55 (10th Cir. 1966), and the Board, itself, see Retail Associates, Inc., 120 NLRB 388, 395 (1958). Here we are not dealing with individual withdrawals of members from a multi-employer unit. If there came into being such a unit, lasting for the short period of the abortive negotiations with the UMW, such unit was completely destroyed by the unusual circumstances outlined at length in this opinion.

Furthermore, it is doubtful that Grundy Mining ever became a member of the multi-employer group. Its membership in Sewanee was conditioned upon a choice by its employees of the UMW as their bargaining agent. Such condition was never, under our view, fulfilled. Additionally, the request by the Southern Labor Union for a separate election for the Grundy employees made clear that such employees did not *intend* to be part of a multi-employer unit. In NLRB v. Local 210, Internat'l Bhd. of Teamsters, 330 F.2d 46, 12 A.L.R.3d 800 (2nd Cir. 1964), the Court said:

> "One basic test is whether the multi-employer unit was *created* with the approval, express or implied, of the employees in *each* of the constituent single-employer units." 330 F.2d at 47. (Emphasis supplied.)

In his dissent from the original Decision and Order of September 30, 1963, Board Member Boyd Leedham stated:

> "I construe Grundy's currently qualified application for membership in Sewanee as conditioned upon separate certification of a union as the majority representative of Grundy's employees. I would, therefore, direct a self determination election among Grundy's employees. If they select the same bargaining representative chosen by majority of the employees in the multi-employer unit, I would approve them in that unit. On the other hand, in the event that Grundy's employees select a different representative, or no repre-

sentative, they would be excluded from the multi-employer unit and either constitute a separate appropriate unit, or be unrepresented."

■ We are persuaded that the events before and after the election of October 15, 1963, destroyed the consenuality needed to justify the creation and, in all events, the continuation of a multi-employer unit. The abortive effort of the Sewanee Association to come to agreement with UMW before the commencement of the strike, called by the latter, did not foreclose withdrawal, from whatever multi-employer unit may have once existed under the unusual circumstances here present.

We are also of the view that in all events by the time the certification of the UMW as the exclusive bargaining agent of Tennessee Products and the other respondents was made on June 7, 1965, there was not in existence a legitimately identifiable multi-employer unit which could be required to bargain with the UMW. We so hold.[2]

### The alleged Section 8(a) (1), (2) violations.

On July 16, 1964, respondents Poplar Coal Company and Sycamore Coal Company[3] entered into collective bargaining agreements with the Southern Labor Union. On July 1, 1965, the United Mine Workers filed a charge that such contracts violated Sections 8(a) (1) and (2)

of the Act, 29 U.S.C.A. § 158(a) (1) and (2),[4] claiming that these contracts dominated or interfered with the formation or administration of a union and constituted providing support to the SLU. These charges were consolidated and decided with the 8(a) (1) and (5) violations discussed above. Respondents Poplar and Sycamore asserted in defense the six-month statute of limitations provided in Section 10(b) of the Act, 29 U.S.C.A. § 160(b).[5]

■ In addition to their defense of the statute of limitations, Poplar and Sycamore assert that ultimate invalidity of the certification of UMW as the bargaining agent for them absolves them of any violation of § 8(a) (2). It has been held, however, that whether there has been a valid certification or not, an employer's entry into a contract with one union may be considered violative of the Act where there existed a serious question as to the membership of its employees in the union contractually recognized by the company. NLRB v. North Electric Company, 296 F.2d 137, 139 (6th Cir. 1961); NLRB v. Signal Oil & Gas, 303 F.2d 785, 788 (5th Cir. 1962); Iowa Beef Packers, Inc. v. NLRB, 331 F.2d 176, 182 (8th Cir. 1964); NLRB v. National Container Corp., 211 F.2d 525 (2nd Cir. 1954).

■ If there was no evidence as to whether all of the Sycamore-Poplar employees, or a majority of them, were

---

2. The basis for our decision makes it unnecessary that we discuss the contentions that all charges of unfair labor practices are barred by the statute of limitations and that conflict of interest between the UMW and its members should bar an order favoring the union. We, however, consider both of these contentions to be without merit."

3. The record is confused as to whether there were two such entities, or whether together they constituted a single enterprise owned and operated by one H. Willis Flynn. This, however, is not of controlling importance here.

4. "§ 158. *Unfair labor practices.* (a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: * * *."

5. "§ 160(b) * * * *Provided,* That no complaints shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *."

members of SLU, the critical question remained unanswered. The Trial Examiner made no finding in this regard. The burden is on the General Counsel to come forward with evidence to support a claim of violation. NLRB v. Murray Ohio Mfg. Co., 326 F.2d 509, 513 (6th Cir. 1964); Lawson Milk Co. v. NLRB, 317 F.2d 756, 760 (6th Cir. 1963); NLRB v. Cleveland Trust Co., 214 F.2d 95, 99 (6th Cir. 1954).

█ What evidence there was strongly suggested that Flynn's operation was a small one, an offshoot of Grundy, trying to operate with SLU, which union had sought a separate election of Grundy's employees. We entertain serious doubt that the proofs established that the Flynn-SLU contract violated Section 8(a) (2). However, we will not undertake to resolve it, satisfied that prosecution of the charged violation was barred by the limitation provided by Section 10(b).

The charge of violation of Section 8(a) (1) and (2) was not made until July 1, 1965, almost a year after the accused contract or contracts of July 16, 1964. If there was a violation, that is the date it occurred. The assertion of the Board that the contract, to run for three years, was a continuing violation, was considered and disposed of by the Supreme Court's opinion in Local Lodge No. 1424 v. National Labor Relations Board, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed. 2d 832 (1960), where the Court said:

"In any real sense, then, the complaints in this case are 'based upon' the unlawful execution of the agreement, for its enforcement, though continuing, is a continuing violation solely by reason of circumstances existing only at the date of execution. To justify reliance on those circumstances on the ground that the maintenance in effect of the agreement is a continuing violation is to support a lifting of the limitations bar by a characterization which becomes apt only when that bar has already been lifted. Put another way, if the § 10(b) proviso is to be given effect, the enforcement, as distinguished from the execution, of such an agreement as this constitutes a suable unfair labor practice only for six months following the making of the agreement." 362 U.S. at 423, 80 S.Ct. at 830.

We therefore hold that the finding of a violation of Section 8(a) (1) (2) by Sycamore-Poplar was invalid.

Enforcement of the Board's order is, in all respects, denied.

EDWARDS, Circuit Judge, dissenting.

In two consolidated cases Tennessee Products & Chemical Corporation seeks review and the National Labor Relations Board seeks enforcement of orders of the Board (167 N.L.R.B. No. 12) requiring certain Tennessee mine operators to engage in collective bargaining with the United Mine Workers.

Although this record contains both disputes of fact and bitter disputes of inferences from fact, a broad outline of undisputed facts may be stated:

In September of 1962, 41 coal companies in southeastern Tennessee formed the Sewanee Coal Operators Association for the purpose of bargaining with the United Mine Workers. Many of these companies had had a previous history of collective bargaining with the UMW.

The Sewanee Coal Operators Association and the UMW met in four collective bargaining sessions in late 1962. No agreement was reached, and in late December 1962 the UMW went out on strike. This record indicates that the strike is still continuing.

After the strike was in progress, the union petitioned for an election, and on October 15, 1963, an election was conducted for the employees of the 41 coal companies which the NLRB had found to be the appropriate bargaining unit representing all of the Sewanee Association operators. The majority of the ballots cast were challenged. The operators also challenged the election because of pre-election violence. They also challenged the appropriateness of the bar-

gaining unit because subsequent to the election, in June of 1964, the Sewanee Coal Operators Association was dissolved by resolution of its board of directors and the surrender of its Tennessee State Charter.

After hearing, these challenges were decided by the Board which ruled that the multiemployer unit had not been destroyed and continued to be appropriate, that the election had not been invalidated by violence, and that the UMW had won the election. On June 7, 1965, the Board certified the UMW as the bargaining representative for all production and maintenance employees of the Sewanee operators described as follows:

"[Those] mining operators who were formerly members of the Sewanee Coal Operators Association, including those not now operating but who resume operating old mines either before or after the conclusion of the strike, and including also those individuals who had sole or controlling interest in a corporation which was a member of Sewanee Coal Operators Association who form another corporation and operate a new or different mine in the geographic area here involved."

The UMW then requested bargaining. On refusal, an unfair labor practice complaint was filed. Meantime, a Sewanee operator named Flynn had formed the Poplar and Sycamore Coal Companies, and on July 16, 1964, had signed a contract with the Southern Labor Union (SLU). A hearing was conducted before a Trial Examiner who entered findings and a recommended order.

On August 22, 1967, the NLRB adopted the Trial Examiner's findings and ordered that the past members of now dissolved Sewanee and their successors cease their violations of Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1) and (5) (1964), and bargain collectively with the UMW for a reasonable period of not less than 12 months. The Board also found Sycamore and Poplar were in-

cluded in the employers' bargaining unit and ordered them to withhold recognition of SLU unless and until the Board certified that union. It found that the maintenance of the SLU contract was a violation of § 8(a) (2) and 8(a) (1) of the Act.

These proceedings produced the petition to review in the *Tennessee Products* case and an enforcement petition in the *Basham* case which are currently before us.

Five issues appear to require discussion:

1) Is the multiemployer bargaining unit found by the Board legally appropriate and valid?

2) Was there such a record of pre-election violence as to require setting aside the election and holding a new one?

3) Should the bargaining order be set aside because some of the companies have gone out of business?

4) Should the Board's order be set aside because of claimed conflicts of interest between the UMW and the employees it seeks to represent, or because of asserted UMW violations of the anti-trust statutes?

5) Does Section 10(b) of the NLRA, 29 U.S.C. § 160(b) (1964), bar some or all of the unfair labor practice findings of the Board?

*The Multiemployer Bargaining Unit*

As noted, the record is undisputed that the coal operators who now protest the multiemployer bargaining unit originally founded the Sewanee Coal Operators Association voluntarily for the express purpose of bargaining with the UMW. Further, the acts relied upon to show intent to dissolve Sewanee did not take place until after failure of negotiations, the calling of the UMW strike, and the holding of the representation election.

Also of importance in relation to the appropriateness of the Board-designated bargaining unit is the fact that the 41 operators are by no means a disparate and unrelated group. On the contrary, the record shows that all of the operators

had been engaged in mining in three counties in southeastern Tennessee. Two of the Sewanee companies, Tennessee Products and Tennessee Consolidated Coal Company, owned or controlled virtually all of the coal-bearing land in those three counties. Practically all of the coal mining in the three counties concerned was done under lease arrangements with either Tennessee Products or Tennessee Consolidated.

Nonetheless, the operators protest the appropriateness of the bargaining unit, claiming ·that the prior history of collective bargaining showed individual collective bargaining contracts, and that the record demonstrates no employer intent to be bound by group action. As far as Grundy and Consolidated are concerned, they assert that each of them joined the Sewanee Association only on the condition of an NLRB certification of a union among *their* individual employees units.[1]

As to these contentions, the Trial Examiner and the Board found as follows:

"We consider first Sewanee's contention that there is no controlling history of bargaining on a multiemployer basis. To support that contention, Sewanee relies primarily on the practice of the employers to sign separate, though identical, agreements with the Union. But that circumstance is not necessarily decisive in determining whether an appropriate multiemployer unit has been established. Association-wide units may be appropriate even though separate contracts are signed,[4] or multiemployer bargaining has been conducted on the basis of an informal association.[5] The test is whether the employer parties have manifested an intent to be bound by group rather than individual action.[6] In the circumstances here, we believe that test is met. In the past the same employers who now constitute the membership of Sewanee had agreed to be bound by the identical agreement that Consolidated and Products had

negotiated through Southern Tennessee Coal Producers Association. The bargaining history also reflects that the intent on the part of the companies to bargain on a multiemployer basis is a continuing one. This is clearly evidenced by the fact that in 1962 the employers who had theretofore engaged in informal joint bargaining banded themselves into a formal association whose charter reveals the intention of its members to adhere to multiemployer bargaining. And it is confirmed by the fact that Sewanee on behalf of its members actually entered into negotiations with the UMW on a multiemployer basis. In view of this background manifesting the intention of Sewanee's members to bargain jointly, we find in agreement with the UMW, which by its petition as well as by its prior course of bargaining has manifested a similar intent, that an association-wide unit is appropriate at this time.

"We consider next the issue whether Grundy's employees should be included in the association unit or should constitute a separate unit. Grundy argues that it should not be included in the unit with the other members of Sewanee because at the time of its application for admission into that association it withheld from Sewanee final authority to bargain on its behalf.

"As appears from the minutes of a meeting of Sewanee held in October 1962, Grundy, Consolidated, and Products at that time requested permission to become members of Sewanee, but on the condition ' * * * that the association would not negotiate for Tennessee Consolidated Coal Company, Grundy Mining Company, and Tennessee Products and Chemical Corporation until the United Mine Workers had been duly certified by a Board election.'

---

1. Tennessee Products joined in this contention before the Board, but has not advanced it in this court.

"At the hearing herein, both a UMW representative and an official of the Grundy Mining Company testified that at the first bargaining session between Sewanee and UMW a representative of Grundy stated that Grundy was not to be considered bound by the negotiations until 'a union' was certified.

"The critical question here, therefore, concerns the effect to be given to Grundy's conditional application for membership in Sewanee. At first glance, Grundy's action might suggest that it did not want to be bound by group bargaining. But the very fact that it sought admission in a multiemployer association indicates its interest in participating in collective bargaining on a multiemployer basis. Moreover, Grundy did not indicate either to other members of Sewanee or to UMW, at any time after requesting membership, or after bargaining commenced, that it no longer wished to become a member, or that it desired to pursue an individual course of bargaining. We also note that included in the contract proposed to UMW by Sewanee was a mine classification styled 'A,' describing a relatively large, mechanized mine such as only Grundy operates. In these circumstances, we construe Grundy's action as manifesting an intention to join Sewanee and to be represented by it subject only to the condition of union certification on an association-wide basis. That the condition contemplated a certification based on an election in an association-wide unit also finds support in the minutes of the Sewanee meeting, adverted to above, where Products, Grundy, and Consolidated are listed *in the conjunctive* as imposing the condition. Moreover, as Consolidated has no employees of its own, a union would have to be certified on the basis of an election in an association-wide unit, including the three named companies, for Products, Grundy and Consolidated to become unconditional members of Sewanee. (Emphasis in original.)

"Thus, only a Board election conducted in an association-wide unit will determine whether Grundy will be bound by group bargaining. If a union is certified as the representative of all employees in the unit, Grundy will thereby become a member to the same extent as the other members of Sewanee. On the other hand, if no union is certified, Grundy's application for membership will lapse by reason of the failure of the condition. Therefore, since the question concerning Grundy's membership in Sewanee can only be settled by an election in an association-wide unit, we shall include Grundy in the unit found appropriate herein.

"Accordingly, we find that a unit comprising the employees of all members of Sewanee Coal Operators' Association, Inc., including Grundy Mining Company, is appropriate. We further find that the following employees constitute a unit appropriate for purposes of collective bargaining within the meaning of Section 9(b) of the Act: All production and maintenance employees of employer members of Sewanee Coal Operators' Association, Inc., excluding office clerical employees, professional employees, technical employees, guards, owner-operators, mine foremen, and other supervisors as defined in the Act.

"4. Belleville Employing Printers, 122 NLRB 350.

"5. Harbison-Walker Refractories Company, 137 NLRB 1686.

"6. The A. B. Hirshfield Press, Inc., 140 NLRB No. 35."

As indicated, there was a great deal of evidence—much of it undisputed—to support these findings.

Further, national labor policy as expressed by law places the responsibility for determining the appropriate bargaining unit upon the Board. 29 U.S.C. § 159(b) (1964).

While the decision of the Board on this subject is not beyond judicial review, the Supreme Court has made it clear that an

appropriate bargaining unit determination should not be disturbed unless it is arbitrary. On this subject the Supreme Court said:

"The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed. While we do not say that a determination of a unit of representation cannot be so unreasonable and arbitrary as to exceed the Board's power, we are clear that the decision in question does not do so. That settled, our power is at an end." Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491–492, 67 S.Ct. 789, 91 L. Ed. 1040 (1947).

The designation of multiemployer units where not arbitrary is within the discretion of the NLRB. NLRB v. Checker Cab Co., 367 F.2d 692 (6th Cir. 1966), cert. denied, 385 U.S. 1008, 67 S.Ct. 715, 17 L.Ed.2d 546 (1967); NLRB v. Teamsters Local 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957).

In this last case the Supreme Court said:

"[T]he compelling conclusion is that Congress intended 'that the Board should continue its established administrative practice of certifying multiemployer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multiemployer bargaining bound to arise in the future.'

\*    \*    \*    \*    \*    \*

"The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." (Footnotes omitted.) NLRB v. Teamsters Local 449, supra 353 U.S. at 96, 77 S.Ct. at 648.

Clearly in our instant case the coal operators voluntarily formed a multiemployer association (Sewanee) for purposes of collective bargaining with the UMW. The fact that an agreement was not reached, that a strike was called, and that the operators then sought to dissolve Sewanee did not serve to destroy the appropriateness of Sewanee as a bargaining unit. NLRB v. Southwestern Colorado Contractors Ass'n, 379 F.2d 360 (10th Cir. 1967); Universal Insulation Corp. v. NLRB, 361 F.2d 406 (6th Cir. 1966); NLRB v. Sheridan Creations, Inc., 357 F.2d 245 (2d Cir. 1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967).

In the *Universal Insulation* case, this Circuit said:

"Universal contends that it is not bound by the new contract because of its withdrawal from the Association. However, multiemployer bargaining is ' \* \* \* a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining.' National Labor Relations Board v. Truck Drivers Local Union No. 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957), and it follows that such bargaining cannot be effective unless an employer who has designated an employees' association as its bargaining representative is bound by the terms of the negotiated contract. N. L. R. B. v. Jeffries Banknote Company, 281 F.2d 893 (9th Cir. 1960). While it is recognized that membership in a multiemployer unit is wholly voluntary and that an employer is free to withdraw from it, the employer must clearly evince at an appropriate time its intention to do so. N. L. R. B. v. Sklar, 316 F.2d 145 (6th Cir. 1963) and the Board has ruled that withdrawal from a multiemployer unit is untimely absent union consent once negotiations on a new contract have started. The Kroger Company, 148 N.L.R.B. 569 (1964); Ice Cream Frozen Custard Employees, 145 N.L.R.B. 865 (1964); C & M Construction Company, 147 N.L.R.B. 843 (1964); Walker Electric Company, 142 N.L.R.B.

1214 (1963). This rule has recently been followed by the Second Circuit in N.L.R.B. v. Sheridan Creations, Inc., 357 F.2d 245 (March, 1966), and under the facts of this case, it is concluded that it should be followed here." *Universal Insulation Corp., supra* 361 F.2d at 408.

These views have been recently reiterated by this court in a different factual context in Detroit Newspaper Publishers Ass'n v. NLRB, 372 F.2d 569 (6th Cir. 1967). On this record I cannot find arbitrariness in the Board designation of the multiemployer bargaining unit in this case.

### Pre-election Violence

Respondents also assert that the election should be set aside because it was permeated with an aura of violence. The Board held, and I believe, on substantial evidence on the whole record, that since there was no violence for the five months preceding election and no showing that the union was involved in any coercive conduct within that period, the violence was too remote to have a probable effect on the election. NLRB v. Bar-Brook Mfg. Co., 220 F.2d 832 (5th Cir. 1955); Southdown Sugar, Inc., 108 N.L.R.B. 114 (1954).

The Board itself dealt with this issue at some length in its opinion:

"UMW excepted to the Regional Director's recommendations to sustain the portions of the objections relating to pre-election violence and to electioneering and crowding of people at the polls.

"The alleged pre-election violence related to two incidents which occurred in April and May 1963, more than 5 months before the election. Each incident was the subject of separate charges, which resulted in findings of Section 8(b) (1) (A) coercion.[4] As found by the Trial Examiner in those two cases, on April 24, 1963, UMW, Local 7244 and its supporters engaged in mob threats and violence against employees of Grundy to prevent them from meeting to organize and elect officers for a Grundy Local of SLU; and on May 7, 1963, UMW, Local 7083 and its supporters engaged in mob threats and violence to prevent Grundy strike replacements from going to work at the Grundy minesite.

"These two incidents occurred in the context of an economic strike called by UMW against Grundy commencing December 26, 1962; UMW's petition herein, filed February 25, 1963, for a multiemployer unit of Sewanee members' employees' including Grundy's; and UMW's charges of unlawful assistance by Grundy to an independent union, which charges, under Board practice, blocked the processing of UMW's representation petition. On May 20, 1963, a settlement agreement with respect to UMW's charges of Section 8(a) (2) assistance was approved by the Regional Director, and on May 23, 1963, SLU filed its petition herein seeking a separate unit of Grundy employees. The Board found a multiemployer unit, including Grundy, to be appropriate, in the event a majority of employees in such unit voted for UMW or SLU, and, as above indicated, the election was conducted on October 15, 1963.

"Unlike the Regional Director, we conclude that in the circumstances above outlined, UMW's strike misconduct, found violative of the Act, could have no substantial impact on voter free choice in the election. In view of the lapse of more than 5 months from the occurrence of the strike violence in question to the holding of the election, and the absence of any showing that in this interval of time any other coercive conduct was directed at employees in the unit, we find that the incidents relied on in the objections were unrelated to the election and too remote to have a probable effect upon the election.[5]

"As to those portions of the objections relating to electioneering and crowding at the polls, the Regional Director found that a large number of

persons including strikers, nonstrikers, replacements and others congregated on the sidewalk and street immediately outside the polling place before and during the polling period. The election was conducted in a vacant store on courthouse square at Jasper, Tennessee,[6] on a day the Criminal Court was in session. Four Board agents conducting the election were assisted by two U. S. Marshals. The crowd was estimated to number from 200 to 2000 at various times, with a line of voters four to six deep extending from the entrance of the polling place down the sidewalk for a block or more. While the polls were opened, several unidentified persons circulated about the voting line outside the polling place wearing placards reading 'VOTE FOR UNITED MINE WORKERS AND BE ABLE TO GET A PENSION.' The Board Agent did not specify any 'no electioneering area' but did caution representatives not to enter the polling place during the election. The Regional Director based his finding concerning crowding upon pictorial evidence submitted during investigation.[7] However, he does not point to any specific incidents of disorderliness or coercive conduct but merely couples the evidence of electioneering and crowding immediately outside the polling place with the much earlier incidents of strike violence which we have found to be too remote to have an effect upon the election.

"We conclude that, under the facts here, the presence of a crowd or a massing of voters at the entrance to the polling place and the placard electioneering by unidentified persons on behalf of UMW in the area outside the polls, standing alone, did not impair the exercise of free choice in the election.

"4. United Mines Workers of America, Local No. 7083, 146 NLRB No. 20; and United Mine Workers of America, Local No. 7244, 146 NLRB No. 29, In each case the Trial Examiner's Decision, later adopted by the Board, had

issued prior to the issuance of the Regional Director's report herein.

"5. See, e. g. Southdown Sugar, Inc., 108 NLRB 114, Krambo Food Stores, Inc., 101 NLRB 742, 743; The LaClede Gas Light Co., 80 NLRB 839, 841.

"6. Jasper was selected as the site of the election in part because it had not been the scene of any pre-election violence and adequate law enforcement was available. The site was suggested by attorneys for Sewanee and Grundy and approved by the Regional Director.

"7. In its exceptions, UMW asserts that it knows of only four pictures taken of the election and attached those pictures to its brief. The pictures appeared in area newspapers, and the accompanying stories described the crowd as orderly and the election as without disorder. In addition, UMW attached affidavits from law enforcement officers, merchants, county officials and other citizens of Jasper who observed the election and found it proper and orderly."

At times in National Labor Relations Board cases suggestions are advanced that the Board in performing its duties listens with a more attentive ear to witnesses for complaining labor unions than to witnesses presented by employers, and that its decisions as a consequence are biased. It is instructive to read the opinions of the Trial Examiner and the Board in the two unfair labor practice complaints against the United Mine Workers involving alleged violent and coercive conduct by it and its members in this dispute. UMW, Local 7083 [Grundy Mining Co.] and Southern Labor Union, 146 N.L.R.B. 176 (1964); UMW, Local 7244 [Grundy Mining Co.] and Southern Labor Union, 146 N.L.R.B. 244 (1964).

On the records in each of these two cases, where the testimony of the opposing parties was in sharp conflict, the Board found the facts against respondent UMW and in each instance the Trial Examiner recommended and the Board entered a series of cease and desist orders. These orders placed the power of the federal government squarely against continuation of violent or coercive conduct. Apparently these orders had some effect, even though they had not yet become final by the date of the

disputed election. In any event, the full knowledge on the part of the Board of the background of the representation dispute and the Board's participation in the suppression of violence and coercion clearly entitled it to assert knowledge and expertise concerning conditions and climate at the election site on the day on which this election was conducted.

I believe the Board's certification of this union was within "the wide degree of discretion" entrusted to the Labor Board by Congress in relation to representation matters. NLRB v. A. J. Tower Co., 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 332 (1946).

Other issues posed by these cases require less discussion.

### The Effect of "Going Out of Business"

Tennessee Products and other of the former operators contend that they are not in the business of mining coal, have not been in that business for years, and never intend to go back into that business. The Board order applies, however, only to those who do go back into business. The order specifies that any employer "who continues completely inoperative and outside the unit * * * may avoid the obligation imposed." Obviously, as long as some operators do not go back into operation, the Board order would be completely ineffective as to them, but it could also do no damage.

In view of the nature of the Board's order, the motion to reopen proofs to show Tennessee Products' non-operational status was properly denied.

### Statute of Limitation

The operators also urge that Section 10(b) of the NLRA renders the orders of the Board invalid. Section 10(b) provides in pertinent part:

"Provided * * * no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service thereof upon the person against whom such charge is made * * *." 29 U.S.C. § 160(b) (1964).

I believe, as did the Board, that this record must be read as showing a continuing demand for bargaining on the part of the UMW and a continuing refusal to bargain on the part of the operators. See International Union UAW v. NLRB, 124 U.S. App.D.C. 215, 363 F.2d 702, 706–707 (1966), cert. denied, 385 U.S. 973, 87 S.Ct. 510, 17 L.Ed.2d 436 (1967).

Similarly, while the Poplar Coal Company contract with the Southern Labor Union was signed considerably more than 6 months before the unfair labor practice complaint, Poplar's (i. e. Flynn's) refusal to bargain was a continuing refusal and its illegal recognition of SLU was a continuing act up to the date of the unfair labor practice complaint. A collective bargaining agreement entered into, or continued, with one union while another union is the certified representative of the bargaining unit is, I believe, invalid "on its face." Local Lodge 1424, Int'l Ass'n of Machinists v. NLRB, 362 U.S. 411, 415, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). See also NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 44, 57 S.Ct. 615, 81 L.Ed. 893 (1937); Virginia Ry. v. System Fed'n 40, Ry. Employees Dept., AFL, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789 (1937). In addition, like the refusal to bargain referred to above, the continued recognition of SLU represented an unfair labor practice within the six month's limitation period "as a substantive matter." Cf. Local 1424, Int'l Ass'n of Machinists v. NLRB, supra at 416, 80 S.Ct. 822 (1960).

### Antitrust and Conflict of Interest Claims

Finally, the operators assert—with great vigor on the part of Tennessee Products—that an antitrust judgment against the UMW in the United States District Court for the Southern District of Tennessee (Ramsey v. UMW, 265 F.Supp. 388 (E.D.Tenn.1967), aff'd, 416 F.2d 655 (6th Cir. 1969), in a case which is on appeal here now, represents final

adjudication of a conflict of interest which would prohibit the Board from requiring them from bargaining with the UMW. It is clear, however, that no conflict of interest or restraint of trade facts were tendered as a defense in this NLRB proceeding. It is also clear that the conflict of interest claimed to have been found by the District Court in UMW's purchase of an interest in West Kentucky Coal terminated, as shown by the same District Court record, before the election in this proceeding and years before the certification of the UMW.

Parenthetically, I note that no issue of the UMW's refusal to bargain was presented to the Board or to us, nor would this record justify such a finding.

The petition for review should be dismissed. The petition for enforcement of the orders of the Board should be granted.