316 F.2d 145
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Gerald SKLAR and Alfred Goldman, CoPartners d/b/a Michigan
Advertising Distributing Company, and Detroit
Mailers Union No. 40, International
Typographical Union, AFL-CIO,
Respondents.
 No. 15016.
 United States Court of Appeals Sixth Circuit.
 April 22, 1963.
 
 Elliott Moore, N.L.R.B., Washington, D.C. (Stuart Rothman, Gen. Counsel, Dominick L, Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Atty., N.L.R.B., Washington, D.C., on the brief), for petitioner.
 Stanley Gelfund, Detroit, Mich., for Sklar & Gelfund, d/b/a Michigan Advertising & Distributing Co.
 Sheldon L. Klimist, Detroit, Mich. (Zwerdling, Miller, Klimist & Maurer, A. L. Zwerdling, Detroit, Mich., on the brief; Van Arkel & Kaiser, Washington, D.C., of counsel), for Detroit Mailers Union No. 40 International Typographical Union, AFL-CIO.
 Before MILLER and WEICK, Circuit Judges, and BOYD, District Judge.
 WEICK, Circuit Judge.
 
 
 1
 This case has questions as to when and how an employer,[1] who is a member of a multi-employer unit for collective bargaining purposes, may withdraw therefrom and bargain individually with a labor union.
 
 
 2
 The Board held, in representation proceedings, involving rival labor unions, in which the employer, MAD, did not participate except to supply information concerning its interstate business, that the withdrawal was not timely and that MAD was barred by estoppel from withdrawing because it had not given notice to the Board of contratual dealings with the respondent union[2] during the pendency of said proceedings. The Board held the multi-employer unit appropriate and ordered an election. The Board subsequently found, in unfair labor practice proceedings, that MAD had violated Section 8(a)(5) and (1) of the National Labor Relations Act, as amended, by refusing to recognize the rival union certified by the Board after an election and after the individual agreement had been entered into with DMU-ITU and by refusing to sign another contract with the rival union. The Board further found that DUM-ITU had violated Section 8(b)(1)(A) of the Act by allowing MAD to recognize it as the bargaining agent for its own members. 29 U.S.C. 151 et seq.
 
 
 3
 Orders entered by the Board, in representation proceedings, when incidental to orders in unfair labor practice proceedings, are subject to review in this Court. A.F. of L. v. N.L.R.B., 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347; Timken-Detroit Axle Co. v. N.L.R.B., 197 F.2d 512 (C.A.6); Ohio Power Co. v. N.L.R.B., 164 F.2d 275 (C.A.6).
 
 THE BARGAINING HISTORY
 
 4
 MAD had been engaged for about thirty-five years in job printing and distributing advertising circulars by door-to-door and direct mail in the Detroit area. Printing shops which used rotary presses were known as 'rotary' shops. Other shops, such as MAD, using flatbed or offset equipment were known as 'commercial' shops.
 
 
 5
 The employees in both types of shops who addressed and prepared material for mailing were represented for a number of years by DMU-ITU. Prior to 1947 a single contract was negotiated with DMU-ITU which covered all mailers in the rotary and commercial shops. From 1947 to 1956 all agreements were oral. During the period of the oral agreements it was the practice to treat rotary and commercial shops separately.
 
 
 6
 On April 30, 1956, two written collective bargaining agreements were entered into by DMU-ITU, one with the rotary shop employers and the other with eleven commercial shop employers. These agreements extended to January 31, 1958. We are here concerned only with the commercial shop agreement which was signed by eleven of the commercial shop employers, including MAD. The Board in its findings described the negotiations which led to the signing of the agreements.[3]
 
 
 7
 With respect to the commercial shops the Board said:
 
 
 8
 'The commercial shops appear to have acted together, but in a very informal manner. Prior to the initial joint negotiating meeting the commercial Employers informally designated as their chairman an official of one of the nonmember Employers. The extent of the chairman's authority to speak for all the commercial Employers or for those not present is not clear. At least some of the commercial Employers met with such chairman prior to the initial negotiation meeting to discuss their approach to the coming negotiations. Also, about 5 or 10 minutes before the meeting between the commercial Employers and DMU-ITU, the chairman met separately with the commercial Employers who were present at that time. At no time did all commercial Employers meet to discuss the contract or the problems growing out of it, and at least one Employer, Chene Printing Company, never participated in any discussions with any of the other Employers and never attended any negotiating meetings. On the other hand, all Employers were aware that the negotiations were in process, were kept informed of the progress of the negotiations, and they all signed the contract without questioning its terms.'
 
 THE REPRESENTATION PROCEEDINGS
 
 9
 In October 1956, certain members of Local No. 40 sought to disaffiliate the local from the International Typographical Union and affiliate with International Mailers Union. The International Typographical Union resisted this effort. Two rival organizations thus claimed to be Detroit Mailers Union No. 40.[4] Shortly thereafter five of the commercial employers including Michigan Advertising Distributing Company signed supplemental agreements with the seceding group recognizing it as the Union party to the 1956 agreement.
 
 
 10
 On November 2, 1956, DMU-IMU filed a representation proceeding with the Board seeking an election among the mailers covered by the 1956 contract.[5] DMU-IMU claimed that on account of the schism among members of Local No. 40 that the 1956 contract was not a bar to an election. The Board did not pass upon this point since the 1956 contract expired before the Board reached a decision. DUM-ITU intervened in the proceeding contending that single-employer units were appropriate.
 
 
 11
 During the pendency of the representation proceeding, namely, on May 30, 1957, DMU-ITU negotiated an amendment to the 1956 agreement with MAD giving status to employees as journeymen-learners with an opportunity to become journeymen and providing for a wage scale to be effective until May 31, 1962. MAD's employees who belonged to DMU-IMU went on strike and the strikers were replaced by workers furnished by DMU-ITU. On January 16, 1958 DMU-ITU notified MAD it desired to reopen the 1956 agreement. MAD and DMU-ITU met and negotiated over a period of five months and entered into a collective bargaining agreement on August 6, 1958.
 
 
 12
 On July 23, 1958 the Board granted the petition for election holding that the multi-employer unit was appropriate.
 
 THE PETITION FOR REHEARING
 
 13
 DMU-ITU petitioned the Board for a rehearing on the ground that the Board's decision as to the appropriateness of the multi-employer unit was not supported by substantial evidence. It further urged that reconsideration was required 'as to one employer, Michigan Advertising Distributing Co. because an existing contract with DMU-ITU is a bar to the election.'
 
 
 14
 The Board then wired MAD requesting information as to its position in this matter as follows:
 
 
 15
 'Mr. Stanley Gelfund, '3063 Penobscot Bldg., 'Detroit 26, Michigan.
 
 
 16
 'Re: American Publishing Corporation, Et Al., 7-RC-3336, 7-RC-3337, please advise your position promptly if any, Re: Motion filed by Local 40, ITU Re: Michigan Advertising and Distributing Company.
 
 
 17
 'NATIONAL LABOR RELATIONS BOARD'
 
 MAD responded:
 
 18
 'National Labor Relations Board
 
 
 19
 'Regarding American Publishing Corporation Et Al., 7-RC-3336 and 7-RC-3337, Michigan Advertising Distributing Company agrees with thought expressed in Local 40 ITU motion urging severance of this company from determined unit and vacating of direction of election with respect to it. Company has had continuous contractual relationship individually negotiated with Local 40 ITU since April 30, 1956 and existing contract does not expire until May 31, 1962. We deem ourselves bound by this contract and are eminently satisfied with the relationship.
 
 
 20
 'STANLEY GELFUND'
 
 
 21
 On August 15, 1958, the Board entered an order denying DMU-ITU's petition for rehearing, but ordered that MAD employees vote by challenge ballot and that ruling be reserved as to whether MAD was 'properly included in the multiemployer unit of commercial shops.'
 
 THE BOARD REOPENED THE CASE
 
 22
 On October 31, 1958, the Board entered a further order reopening the record and remanding the proceeding to the Regional Director for further hearing with respect to the termination of the 1956 agreement and negotiations of the individual agreement between MAD and DMU-ITU.
 
 
 23
 In a supplemental decision, the Board followed its previous ruling that the multi-employer unit should not be disturbed and after an election certified DMU-IMU as the representative of the employees in the unit, Member Bean dissenting. DMU-IMU then presented MAD with a written agreement signed by the other commercial employers in the unit. MAD refused to recognize DMU-IMU or execute the agreement.
 
 
 24
 Member Fanning dissented from the order of the Board entered in the unfair labor practice proceedings which found that MAD and DMU-ITU violated the Act. He agreed with Member Bean that MAD had effectively withdrawn from the multi-employer unit and, therefore, was not properly included therein.
 
 THE MERITS DISCUSSED
 
 25
 In our opinion, although the relationship was very informal, the Board was justified in entering its order of July 23, 1958 holding that the multi-employer unit was appropriate and calling for an election because of the status of the record at that time. No evidence had then been offered before the Board as to the desire of MAD to withdraw or as to the separate negotiations between MAD and DMU-ITU which led to the agreements of May 30, 1957 and August 6, 1958. The contract between MAD and DMU-ITU was brought to the Board's attention for the first time in the petition for rehearing filed by DMU-ITU.
 
 
 26
 The course of action taken by the Board following the filing of the petition for rehearing clearly indicated that it was not standing on its order of July 23, 1958. This was shown by the Board's telegram to MAD to ascertain its position with respect to the petition for rehearing and the response thereto in which the Board was unequivocally advised that MAD agreed to its severance from the multi-employer unit; that MAD had continuous contractual relationship individually with DMU-ITU since the 1956 contract and that its existing agreement did not expire until 1962.
 
 
 27
 There was certainly no occasion for the Board to reserve ruling on whether MAD was properly included in the multiemployer unit and to order that the employees of MAD vote by challenge ballot, if the Board was insisting that its order of July 23rd was final. If there was any question about this, the Board removed it by its order of October 31, 1958 reopening the record and remanding the proceedings to the Regional Director for further hearing. As we view it, this meant that the issue as to the appropriateness of the unit was to be determined de novo.
 
 
 28
 It appears to us that the only estoppel claimed by the Board related to the failure of the respondents to advise the Board of their contractual dealings prior to the order of July 23, 1958. The trouble with this contention is that the Board thereafter reopened the case and was then advised as to all of the facts. No estoppel could possibly exist with respect to the orders entered subsequent to July 23, 1958.
 
 
 29
 Furthermore, the principals in the representation proceedings before the Board were the two rival labor unions. MAD did not participate in the proceedings. It had no way of knowing whether the Board would find that multi-employer or single-employer units would be appropriate. The 1956 agreement had expired for nearly six months before the order of July 23, 1958 was entered. The history of collective bargaining of the multiemployer unit had been with DMU-ITU and not the rival union. Under the circumstances here, since the 1956 agreement had expired we think it was appropriate for the Board to obtain, as it did, MAD's position as to whether it desired to remain in the multi-employer unit. In our judgment, the Board should have respected the desire of MAD to withdraw therefrom.
 
 
 30
 There was even reason for the Board to grant MAD the privilege to withdraw if because of the schism in the Union a new election would be ordered.
 
 
 31
 The Act contains no express provisions relative to multi-employer units, however, the Board has traditionally established such units for collective bargaining purposes where the employers have consented thereto. Such procedures have served a useful purpose. The authority of the Board to do so was sanctioned by the Supreme Court in N.L.R.B. v. Truck Drivers Local 449, 353 U.S. 87, 95-96, 77 S.Ct. 635, 1 L.Ed.2d 676.
 
 
 32
 Membership of an employer in a multi-employer unit is wholly voluntary. The unit can only be created with the consent of the employers. The Board may not force any employer to join a multiemployer unit or prevent him from exercising his right to withdraw therefrom at an appropriate time. The fact that MAD had been a member of a multi-employer unit did not consign it to that status forever. The Board has recognized that an employer may withdraw from the multi-employer unit provided that it clearly evines at an appropriate time its intentions of pursuing an individual course in bargaining. International Brotherhood of Electrical Workers, AFL-CIO, 119 N.L.R.B. 1792, 1793; McAnary & Welter, Inc., 115 N.L.R.B. 1029; Bagley Produce Co., 108 N.L.R.B. 1267; York Transfer & Storage Co., 107 N.L.R.B. 139; Milk & Ice Cream Dealers of the Greater Cincinnati Area, 94 N.L.R.B. 23, 25.
 
 
 33
 As to the appropriate time, the Board, in 20th Century Press, 107 N.L.R.B. 292, 293, said:
 
 
 34
 'The intervenor contends that the Employer did not give timely notice of withdrawal from the multiemployer group. We do not agree. Withdrawal in the instant case occurred after the expiration of the most recent multiemployer agreement. This is precisely the time at which the Board will permit withdrawal from multiemployer bargaining.'
 
 
 35
 In the present case, the withdrawal was manifested by the contractual relationship between MAD and DMU-ITU subsequent to the 1956 agreement. This included the agreement of May 30, 1957, the negotiations for and the agreement of August 6, 1958, and the telegram to the Board notifying it in plain language of MAD's position. The agreement of August 6, 1958 was entered into after expiration of the 1956 contract.
 
 
 36
 Respondents proffered testimony to the effect that 20 out of 22 of the employees of MAD are members of DMU-ITU. Two do not belong but desire this Union to represent them. DMU-ITU has been representing the employees of MAD for many years. To cut off that relationship now would bring in a rival union which represents none of MAD's employees. We see no reason for creating any additional confusion in this case.
 
 
 37
 Since the Board improperly included MAD in the multi-employer unit it follows that the orders entered in the representation proceedings against MAD and DMU-ITU cannot stand. This disposes of the orders entered in the unfair labor practice proceedings against MAD and DMU-ITU which were predicated on the orders in the representation proceedings and must stand or fall with the orders in those proceedings.
 
 
 38
 The petition for enforcement of the Board's order is denied.
 
 
 
 [1]
 The employer was Michigan Advertising Distributing Company. It will be referred to as MAD
 
 
 [2]
 Detroit Mailers Union No. 40, International Typographical Union, AFL-CIO hereinafter referred to as DMU-ITU
 
 
 [3]
 'Five of the six rotary shops and 6 of the 11 commercial shops are members of the Graphic Arts Association, which is a formal association established for the over-all purpose of taking any steps necessary to better the status of the industry. This Association is an 'umbrella type' organization made up of several different groups, of which the rotary group is one, but it has never organized a commercial group. The Association conducts negotiations for other employer groups, consisting of both members and nonmembers, with other unions. In those instances, the Association has required written authorizations from both members and non-members and has been a signatory to the contracts. However, the Association did not require written authorizations with respect to the negotiations for the contracts covering the mailers, assertedly because of the small number of employers involved and the ease of communicating with them. The Association was not a signatory to the contracts. In negotiating the mailer contracts, the Association's manager attended all meetings and performed the functions of secretary, all communications between DMU-ITU and the Employers prior to the actual signing of the contracts going through him, but he apparently did not participate in the discussions
 'The 1956 negotiations with respect to the mailers followed the same procedure as had been customary in the informal negotiations of prior years. The rotary and commercial Employers met jointly with the union at an initial meeting to discuss the economic provisions, such as wages and overtime, relating to all shops. After the joint meeting, the rotary group and the union met separately to reach agreement, and the commercial Employers thereafter met with the union, adopted the rotary shop agreement to the extent it was applicable to the commercial shop operations, and negotiated concerning the minor matters pertaining to their particular type of operations.'
 
 
 [4]
 The confusion in names continued until the Circuit Court of Wayne County, Michigan ordered the seceding group to change its name to Detroit Mailers Union No. 4, International Mailers Union. It will be referred to as DMU-IMU
 
 
 [5]
 DMU-IMU requested, in the alternative, that if the Board found multi-employer units inappropriate, separate elections be directed in single-employer units