**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHWESTERN COLORADO CONTRACTORS ASSOCIATION and its Members et al., Respondents.**

**No. 8810.**

United States Court of Appeals
Tenth Circuit.
June 15, 1967.

Herman Levy, Washington, D. C., (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel and Anthony J. Obadal, Washington, D. C., on the brief), for petitioner.

Harold B. Wagner, Denver, Colo., for respondents.

Before MURRAH, Chief Judge, LEWIS, Circuit Judge, and CHRISTENSEN, District Judge.

DAVID T. LEWIS, Circuit Judge.

Pursuant to section 10(e) of the National Labor Relations Act,[1] the National Labor Relations Board petitions for enforcement of its order entered upon findings that respondents, Southwestern Colorado Contractors Association and its members, committed unfair labor practices in violation of section 8(a) (5) and (1) of the Act[2] by refusing to engage in joint and collective bargaining with the Colorado State Council of Carpenters and the Carpenters District Council of Southern Colorado,[3] the certified representative of respondents' carpenter-employees. The violation is premised on a determination that the re-

1. 29 U.S.C. § 160(e).

2. 29 U.S.C. § 158(a) (5) & (1).

3. Hereinafter referred to jointly as "the Council."

spondent Association was dissolved as a multiemployer bargaining unit at an inappropriate time and with the manifest purpose of avoiding its statutory bargaining obligations. The subject order, among other things, requires the individual respondent members to recognize and, upon request, bargain jointly and collectively with the Council and to post customary notices. The order does not require formal reconstitution of the Association.

▉ Jurisdiction of the Board is based on treatment of all members of the Association as a single employer, NLRB v. Sightseeing Guides & Lecturers Union Local 20076, 2 Cir., 310 F.2d 40; NLRB v. Cascade Employers Ass'n, Inc., 9 Cir., 296 F.2d 42, and on the finding that two of the members, McGechie Construction Company and Burnett Construction Company, met the Board's dollar-amount jurisdictional standards in the calendar year of the alleged unfair labor practices. See NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279; NLRB v. Burnett Construction Co., 10 Cir., 350 F.2d 57. Respondents urge that there can be no jurisdiction without a showing that McGechie and Burnett employed carpenters and that their dealings with the carpenters' bargaining representative would affect interstate commerce. We find no merit to the argument. First, we would take judicial notice of the fact that pre-hire agreements are quite common in the construction industry and that contractors generally participate in joint collective bargaining over wages and conditions for potential, as well as actual, employees. See section 8(f) of the Act, 29 U.S.C. § 158(f). Second, as stated in *Reliance Fuel,* supra, "Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause." 371 U.S. at 226, 83 S.Ct. at 313. (Emphasis

by the Court.) The statutory test for jurisdiction is whether a labor dispute will tend to obstruct the free flow of commerce, not whether the particular dispute under consideration will do so. Under this test, once jurisdiction is established as it clearly has been here, it is a matter of Board discretion to determine whether and to what extent that jurisdiction will be exercised. See NLRB v. F. M. Reeves & Sons, Inc., 10 Cir., 273 F.2d 710, 711–712,

According to the evidence relied upon by the Board, respondent Association had engaged in collective bargaining and had signed labor contracts on behalf of its members since its organization in 1958. From September 1, 1960 to July 1, 1963, the wages and working conditions of all carpenters, millwrights, and apprentices employed by Association members were covered by two successive bargaining agreements between the Association and those employees' duly certified bargaining representative, Local 2243 of the United Brotherhood of Carpenters and Joiners of America.[4] In June 1962, during the term of first agreement, the Local attempted to have its certification amended by deleting its name and inserting the name of the Council, but officers and members of the Association took the position that they wanted to negotiate with the "Durango Local only" and refused to participate in collective bargaining while a Council representative was present. In July 1962, the Local's request to amend the certification was denied by the Board.

In January 1963, the Association mailed to prospective members a letter and questionnaire which contained the following paragraph:

"As you know our association was organized a few years ago for the primary purpose of conducting labor negotiations with the various crafts of the building and construction trades and to assist members with various

---

4. Certification of Local 2243 was pursuant to a Board election wherein the Association, through its secretary, entered into a consent-election agreement. The two contracts with Local 2243 were signed by both the president and the secretary of the Association.

problems. During the ensuing period we have conducted several negotiations with most satisfactory results. To continue to do so successfully we must have the support and cooperation of the contractors and subcontractors engaged in building and construction in Southwestern Colorado. Since several contracts are due to be opened for negotiations this year we are endeavoring, at this time, to increase our strength and support so that we can sit at the negotiating table secure in the knowledge that the men we are facing across the table realize that we represent a strong, united and responsible organization with whom they must bargain and work." [5]

Thereafter, between January and April 1963, each of the individual named respondents became members of or maintained membership in the Association by payment of $5 for annual dues.

On April 17, the Local and the Council requested the Association to begin negotiations on a new contract, but there was no response. On July 17, however, the secretary of the Association, accompanied by an attorney, met with union officials at the Board's Regional Office and signed an agreement consenting to an election which would determine the representative status of the Council. The secretary secured from each Association member and turned over to the Board a list of employees in the designated unit eligible to vote. According to the secretary's testimony, this list was given by the members with an understanding of the purpose for which it would be used. The election was held on August 7 with the Council receiving a majority of the votes cast. A tally of the ballots was immediately served upon the Association and each of its members. On August 15, having received no objections to the conduct of the election, the Regional Director certified the Council as the bargaining representative for

the carpenters and apprentices employed by members of the Association. On the same day, six members of the Association met and voted unanimously to dissolve the Association as a joint bargaining entity. When the Council wrote the Association on September 7 requesting new contract negotiations, it received from the secretary a reply that the Association "no longer exists as a bargaining unit."

The Board found that for purposes of collective bargaining, the Association was an appropriate, viable multiemployer unit up until the time of its dissolution; that by virtue of the consent given by the Association to the holding of an election the individual respondent members were obligated to bargain in this unit with the Council for the period of the Council's certification; and that such obligation was in no way changed by the decision to do away with the Association's formal organization. In making these findings, the Board reasoned as follows:

"[T]he Association, acting within the implied scope of its agency, executed the consent-election agreement on behalf of its members with their apparent knowledge and acquiescence. Through that agreement, which was binding upon them, the employer members accepted the multiemployer unit as the appropriate unit for collective bargaining and, in effect, consented and agreed, should the Union win the election, to honor the statutory obligations normally flowing from a certification for a period of at least a year. The Union having been certified as statutory representative in these circumstances, we find withdrawal from the agreed-upon form of bargaining within the period of a year was untimely and ineffective."

The Board thus concluded that dissolution of the Association was tantamount to attempted withdrawal from a multi-

5. The letter was written on Association stationery and bore the typewritten signatory names of H. C. Flaugh, President; G. A. Patterson, Vice President; Gordon Royce, Secretary; and Merle Cornelius, Spec. Committee.

employer unit at an inappropriate time, see NLRB v. Tulsa Sheet Metal Works, Inc., 10 Cir., 367 F.2d 55, and that respondents' refusal to bargain jointly with the Council was a violation of the Act.

■■ Respondents' initial argument directed to the merits of the subject order is that the Board has failed to demonstrate that respondents had authorized the Association to bind them in any negotiations or contracts. We think, as did the Board, that the requisite authorization could reasonably be implied or inferred from the course of conduct by respondents over the period of the Association's formal existence. This conduct included their apparent willingness to abide by the negotiations and contracts with bargaining representatives other than the Council,[6] their affirmative responses to the letter of January 1963 by payment of annual dues, and their cooperation in providing the Association with employee voting lists for the August 1963 election. In contrast, there is no evidence cited by respondents which would indicate that they, either individually or collectively, desired or intended not to be bound by the actions taken in the name of the Association. See Fish Industry Committee, 98 N.L.R.B. 696; Coca-Cola Bottling Works Co., 91 N.L.R.B. 351. Respondents also argue that there is no evidence that any of them employed carpenters when the Association consented to the election in the summer of 1963. Aside from the possibility of pre-hire agreements already mentioned with respect to the jurisdictional question, the record shows that respondents supplied a list of their employees eligible to vote for certification of a carpenters' representative, that those employees did in fact vote, and that they elected the Council. We think the Board is therefore correct in saying that it is some-

what late to suggest that these employees do not exist.

■■ According to the cited cases, the appropriate time for withdrawing from a multiemployer bargaining unit is after the expiration of an existing contract and/or prior to the start of negotiations on a new contract. NLRB v. Tulsa Sheet Metal Works, Inc., 10 Cir., 367 F.2d 55; NLRB v. Sheridan Creations, Inc., 2 Cir., 357 F.2d 245; NLRB v. Sklar, 6 Cir., 316 F.2d 145. While, as respondents urge, dissolution of the Association fell within the literal limitations recognized by these authorities, we agree with the Board that respondents' joint bargaining obligation was revived here by the predissolution consent-election agreement and subsequent certification of the Council. Respondents cannot be permitted to agree to an election and then, dissatisfied with the outcome, ignore the commitments, express and implied, previously made. Such action would be an obvious frustration of the policies and purposes of the Labor Act. Nor is respondents' position strengthened by continued emphasis upon the loose internal organization of the Association, its lack of specificity of authority as might have been contained in formal by-laws, the lack of equal interest by the members in the particulars of labor negotiations, and other similar contentions made that caused, as respondents term it, the Association to "fall apart." Despite these shortcomings the Association was functional when its interests were served by being so.

■ Respondents also attack the subject order on procedural grounds. They object first to the use of leading questions under Rule 43(b), Fed.R.Civ.P., in General Counsel's cross-examination of witness Royce, the Association's secretary up until its dissolution. Such questioning would be allowable, say re-

---

**6.** The record shows that on an occasion when the question of travel allowances arose, one of the respondents paid the allowance called for in the contract between the Association and Local 2243.

There is also evidence that seven of the fifteen respondent members participated as Association representatives in negotiations with the local laborers' union during the summer of 1963.

spondents, only if Royce were the managing agent of an existing association of which all respondent businesses were members. We think respondents' emphasis on the continuing formal existence of the Association is misplaced. By virtue of Royce's status as the proprietor of one of the respondent firms as well as his former official position within the Association, his interests and sympathies were clearly aligned with those of the other respondent. See generally Journeymen Plasterers' Protective & Benevolent Society of Chicago v. NLRB, 7 Cir., 341 F.2d 539, 544; Rossano v. Blue Plate Foods, Inc., 5 Cir., 314 F.2d 174, 178–179. Accordingly, with respect to questions propounded to him by General Counsel, he was properly treated as an adverse and hostile witness under Rule 43(b).

Continuing in their emphasis upon the absence of a formal association, respondents also raise several technical objections to the charge and the complaint. The record shows that the charge was filed on December 26, 1963, naming the Association as the employer which had unlawfully refused to bargain. Attached to the charge and referred to therein as "Appendix A" was a list of the respondent members of the Association and their respective addresses. A copy of the charge was served upon the Association at the office of its secretary on the date of filing, but copies were not served upon the individual members until some two months later just before issuance of the complaint. We believe these procedures were proper in all respects. The individual members were incorporated in the charge by specific reference to "Appendix A" and service was timely made upon an appropriate representative of the membership. Since the proceedings were initiated for purposes of establishing a joint or group obligation, we perceive no reason why the individual respondent members should have been charged and served separately. Indeed, in absence of separate requests to bargain by the charging party, separate charges against each member might have been improper.

We have considered respondents' other contentions relating to the section 10(b) limitations period and the minor differences between the charge and the complaint and find them to be without merit.

The order will be enforced.