**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**JOHNSON SHEET METAL, INC.,
Respondent.**

No. 408–70.

United States Court of Appeals,
Tenth Circuit.

May 13, 1971.

Rehearing Denied June 17, 1971.

Elliott Moore, Washington, D. C., Atty. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and John M. Flynn, Atty., on the brief), for petitioner.

William G. Haynes, Topeka, Kan. (Eidson, Lewis, Porter & Haynes, To-

peka, Kan., on the brief), for respondent.

Before CLARK *, Associate Justice, LEWIS, Chief Judge, and ADAMS **, Circuit Judge.

ADAMS, Circuit Judge.

The National Labor Relations Board ("Board") seeks enforcement of its order finding that Johnson Sheet Metal, Inc. ("Johnson") has engaged in unfair practices within the meaning of § 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (the Act). Two questions are raised by the Board's petition. The first is whether substantial evidence on the whole record supports the Board's finding that Johnson *agreed to engage in joint bargaining, untimely withdrew from such negotiations, and by its subsequent refusal to sign a collective bargaining agreement negotiated on its behalf violated* § 8(a) (5) and (1) of the Act. Assuming Johnson committed an unfair labor practice, the second question is whether the Board properly ordered reinstatement of the striking employees. In addition, Johnson argues that the entire matter is now moot because the contract in question expired in 1970.

Johnson is one of several sheet metal contractors in Hutchinson, Kansas. In April, 1966, Johnson recognized Local 29, Sheet Metal Workers International Association, AFL–CIO ("Union") as the collective bargaining representative for its employees. The Union had previously negotiated a Wichita area-wide contract with union contractors,[1] and Johnson signed this agreement after having negotiated certain changes applicable to its business. Johnson was represented in these negotiations by its attorney, Robert J. Gilliland, who had previously negotiated similar agreements for two other union sheet metal contractors in Hutchinson: Stevens, Inc. and Modern, a Division of Building Industries, Inc. A fourth union-represented firm in Hutchinson, Owston Sheet Metal, also signed the Wichita agreement. The contracts signed by Stevens and Modern expired on July 1, 1968, while those of Johnson and Owston expired on April 30, 1968, the same date the Wichita area contract expired.

In January, 1968, before negotiations for new agreements in Hutchinson began, Union Business Representative Ron Weems discussed with Attorney Gilliland the possibility of negotiating "at one time" a new contract for all four Hutchinson companies. Thereafter, Gilliland was retained by Owston to represent it as well as the other three contractors in negotiations with the Union. The Union agreed with Johnson and Owston through Gilliland to extend their contract deadlines from April 30th to July 1st to correspond with the expiration dates previously negotiated for Stevens and Modern. The Union also stipulated that the new agreement would be ratified only by members regularly living and working in the Hutchinson area, and not by the entire Wichita membership of Local 29. On April 26, 1968 Gilliland wrote the following letter to Weems with copies to each of the companies:

"Reference is made to our conference on Wednesday, April 24, 1968, in which you asked for a letter and I *asked for a letter from you in regard to the negotiations toward a new contract to commence* July 1, 1968.

"This is to advise that Johnson Sheet Metal, Inc., Modern, Owston Sheet Metal and Stevens, Inc. will *negotiate jointly with a view to signing separate but uniform contracts* with Local

---

* Associate Justice, United States Supreme Court, Retired, sitting by designation.

** Of the Third Circuit, sitting by designation.

1. This contract was between the Union and the Sheet Metal Contractors Association of Greater Wichita. While Local 29 covered workers in both Wichita and Hutchinson (about fifty miles apart), the contractors in Hutchinson were not members of the Wichita association.

No. 29 for a term commencing July 1, 1968 to replace the existing contracts each of them have with your local". (Emphasis added.)

The meaning of this letter constitutes the core of this dispute.

Between May 8th and July 1st, the parties met eight or ten times in sessions where Gilliland was the sole representative for the Hutchinson contractors. No one from the management of Johnson attended. At the initial meeting, Gilliland presented to the Union a document entitled "Proposal Submitted by Johnson, Owston, Modern and Stevens to Local No. 29", which stated that "the employers propose to enter into *a contract * * *.*" (Emphasis added.) Matters of special concern to Johnson were included in the proposal and negotiated in subsequent meetings for inclusion in the uniform contract.

Since no final agreement had been reached by July 1st, the Union struck Stevens, Modern and Johnson. Several days prior to the strike, Owston sold his interest in his company and withdrew without objection from the negotiations. However, the new owner agreed to work under the Hutchinson contract when one was completed, and in the meantime signed the new Wichita contract which had been consummated in June following a six-week strike. None of the other contractors objected to this arrangement. On July 9, Weems informed Gilliland that the Union was withdrawing all prior concessions. Gilliland did not respond until August 15th, when by telegram he requested a meeting on August 16 "regarding Hutchinson contract negotiations". At the August 16th meeting, Gilliland presented a letter withdrawing all prior proposals by the contractors and notifying the Union that Johnson was "no longer a participant in the negotiations". Weems immediately objected to Johnson's withdrawal and on August 20th notified Johnson by letter of the Union's objection. While maintaining its objection to Johnson's purported withdrawal, the Union did offer to negotiate separately with Johnson. The Company never responded and the Union then filed its charge in this case. On September 16th, the Union reached agreement through Gilliland with Stevens and Modern on a "Hutchinson Contract" which Owston also adopted. Johnson, however, refused to become a signatory.

This Court has held that absent the union's consent or unusual circumstances, withdrawal from joint multi-employer negotiations following the commencement of negotiations on a multi-employer basis is not timely. N.L.R.B. v. Tulsa Sheet Metal Works, Inc., 367 F.2d 55, 57 (10th Cir. 1966). The rationale for this rule is to prevent the employer from using a threat of withdrawal from negotiations as a "bargaining lever" and to minimize disruption of the bargaining process. See N.L.R.B. v. Sheridan Creations, Inc., 357 F.2d 245, 248 (2nd Cir. 1966). The Board found here that Johnson was a member of a joint bargaining group along with three other union contractors. The Board further found *Johnson's attempted withdrawal was met with strong objection by the Union, and that no unusual circumstances existed to justify the withdrawal.* Accordingly, when Johnson refused to sign the Hutchinson Contract, the Board found Johnson violated § 8(a) (5) and (1) of the Act. See also § 8(d) of the Act.

Johnson first argues that the Board's finding that Johnson unequivocally agreed to be bound to a course of group bargaining is invalid because the Board failed to find expressly that such a multi-employer unit of employees constituted an appropriate bargaining unit within the meaning of § 9(b) of the Act. The Board maintains that a finding of appropriateness of the unit was necessarily implied in its order. We believe the Board is correct in its contention and that Johnson has the burden of showing the inappropriateness of the unit. *Cf.* N.L.R.B. v. Schill Steel Products, Inc., 340 F.2d 568 (5th Cir. 1965);

N.L.R.B. v. New Enterprise Stone & Lime Co., 413 F.2d 117 (3rd Cir. 1969).

■ The basic test of the appropriateness of a multi-employer bargaining unit is whether it was created with the approval, express or implied, of the parties. *Cf.* N.L.R.B. v. Local 210, International Brotherhood of Teamsters, 330 F. 2d 46 (2nd Cir. 1964); Tennessee Products & Chemical Corp. v. N.L.R.B., 423 F.2d 169 (6th Cir. 1970). Put differently, a multi-employer unit may be established either by "a controlling history of collective bargaining on such basis, *or an unequivocal agreement* of the parties to bind themselves to a course of group bargaining in the future." Electric Theatre, Inc., 156 N.L.R.B. 1351, 1352 (1966). (Emphasis added.) While there is no history of multi-employer bargaining here, the Board found that the parties unequivocally agreed to engage in such bargaining. This finding of the Board is supported by substantial evidence on the whole record including the following: all four Hutchinson union employers retained Gilliland to represent them; they proposed, through him, to "negotiate jointly" toward "a new contract" which would be "uniform", combining features of previous separate agreements; the Union accepted this proposal, and at the first bargaining session Gilliland submitted a joint proposal from the employers for "a contract". Thereafter only Gilliland met with the Union for the employers; uniform strike action was taken against all the employers (except in the special case of Owston); and the final contract contained some of the concessions originally sought by Johnson. Although the record includes some evidence supporting Johnson's position that the joint meetings were for convenience only, particularly testimony by a co-owner of the company, this Court is not free to "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before

it *de novo.*" Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

Johnson next argues that even if the letter from Gilliland to the Union proposing joint bargaining supports the Board's findings, that proposal was beyond the scope of Gilliland's authority.

However, § 2(13) of the Act provides:

"In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

As this Court noted in United Steelworkers of America v. CCI Corp., 395 F.2d 529, 532 (10th Cir. 1968), this type of provision "has been properly construed as opening the way for application of general rules of agency and particularly the rules of apparent authority." Here, Gilliland represented that he had authority to engage in multi-employer bargaining. Moreover, his representation in this regard was known to the employers. Finally, the later conduct of the employers in making a joint proposal for a contract shows consent to Gilliland's conduct. Accordingly, we believe substantial evidence supports the Board's implied finding that Gilliland had apparent authority from the employers to engage in multi-employer bargaining.

■ Johnson also argues that "unusual circumstances" existed which allowed Johnson to withdraw from the negotiations on August 16th. The circumstance Johnson believes critical is the absence of bargaining from July 1st to August 15th, implying an impasse. But when Johnson withdrew on August 16th, negotiations had resumed and whatever impasse may have existed had ended. In addition, the Board found that the withdrawal was prompted, not by the current status of bargaining, but by

Johnson's determination to end its association with the Union.

 Johnson argues that since the contract negotiated in 1968 has expired,[2] the issue in this action is now moot. However, the Board ordered Johnson to sign and give retroactive effect (including back pay) to that agreement. In these circumstances, the "chief purpose" of the mootness doctrine —"to assure that the adversary system, once set in operation, remains properly fueled"[3]—has no application. Indeed, the Supreme Court recently granted enforcement to an order of the Board requiring an employer to sign a multi-employer contract seventeen months after the contract had expired. N.L.R.B. v. Strong, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969).

■ The only question remaining to be discussed is that of appropriate remedy. Before the strike began, Johnson employed seven people. By August 16th, Johnson had hired a maximum of three permanent replacements, and two of the strikers had returned to work. Since the Board held that the strike was converted on August 16th to an unfair labor practice strike, the employees who were still on strike and who had not been replaced on that date were entitled to reinstatement upon application.[4] The three employees who had been permanently replaced as of that date were held entitled to reinstatement upon application as the former or substantially similar positions became available, before these positions were offered to new employees. This order is supported by Laidlaw Corp. v. N.L.R.B., 414 F.2d 99 (7th Cir. 1969) and American Machinery Corp. v. N.L.R.B., 424 F.2d 1321 (5th Cir. 1970). Johnson's argument against these remedies is that the strike against Johnson ended on August 16th and no unfair labor practice occurred until Johnson refused to sign the contract on September 17th.

We believe that the Board's conclusions regarding these events are supported by the record and that Johnson's argument is without merit.

Accordingly, the order of the Board will be enforced.

---

2. The contract terminated July 1, 1970.

3. Mootness on Appeal in the Supreme Court, 83 Harv.L.Rev. 1672, 1688 (1970).

4. Philip Carey Mfg. Co., etc. v. N.L.R.B., 331 F.2d 720, 729 (6th Cir. 1964).