McAX SIGN COMPANY, INC.,
Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross-Petitioner.

No. 77–3013.

United States Court of Appeals,
Fifth Circuit.

July 10, 1978.

Robert G. Mebus, Charles Lee Perry, Dallas, Tex., for petitioner, cross-respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy, Carl L. Taylor, Assoc.

Gen. Counsel, Charles P. Donnelly, Attys., N.L.R.B., Washington, D. C., David R. Richards, Austin, Tex., for respondent, cross-petitioner.

Before GODBOLD, SIMPSON and MORGAN, Circuit Judges.

SIMPSON, Circuit Judge:

As in *N. L. R. B. v. Beckham, Inc.*, 564 F.2d 190 (5th Cir. 1977), "[t]he sole issue before the Court is whether substantial evidence on the record considered as a whole supports the finding of the National Labor Relations Board that [Petitioner-Cross-Respondent McAx Sign Company, Inc.] manifested an unequivocal intention to be bound by group rather than individual action in collective bargaining, so that [its] refusal to sign the resulting collective bargaining agreement amounted to a refusal to bargain." We hold that the findings of the administrative law judge, subsequently affirmed by a three member panel of the Board, are supported by substantial evidence and that enforcement of the Board's remedial order is required.

## I. THE FACTS

The administrative law judge's findings of fact may be summarized as follows.

 McAx, an employer engaged in the design, manufacture, and erection of electrical signs, had been a party to three collective bargaining agreements with Local 59 of the International Brotherhood of Electrical Workers (the Union) for periods from June 20, 1968 to June 30, 1971, July 12, 1971, to June 30, 1973, and July 1, 1973 to June 30, 1976. These agreements purported to be between the Union and the "Neon Electrical Sign Companies of Dallas, Texas", but the contracts were signed by the individual companies, including McAx.[1] Although the contracts themselves support the inference that each was negotiated by the employers as a unit, the only direct evidence of this practice in the record pertains to the 1973 negotiations.

The contract negotiated in 1973 provided that it would continue in effect until June 30, 1976, and thereafter on a year-to-year basis unless one of the parties gave written notice of its desire to modify or terminate the agreement sixty days prior to the renewal date. On April 30, 1976, McAx and two other companies, Heath and Company and J. F. Zimmerman & Sons, each submitted proposals to the Union. A negotiating meeting was scheduled for May 18.

Present at the May 18, 1976 meeting were McAx president Donald Simpson, representatives from Heath and Company, J. F. Zimmerman & Sons, and the A. B. C. Sign Company, all signatories to the 1973 agreement, and Herbert Hicks, representing the Union. The parties met and negotiated every Tuesday for the following five weeks. Minutes of these meetings reflect that at several points during the negotiations, the employers took time out to caucus and to consolidate their proposals into a single set. By the end of the meeting on June 22, 1976, most of the differences between the employers and the Union had

---

1. Apparently, "Neon and Electrical Sign Companies of Dallas, Texas" was an expression used for convenience in the contracts and did not denote a formal, multi-employer association. The administrative law judge found that while it "did not have any existence in the sense of having a constitution and bylaws, membership requirements, a place of business and the like, its name did appear on the contracts which [McAx] and his fellow contractors have signed for years as the 'Employer' and it may reasonably be inferred that its use reflected the fact that those contractors had agreed to act jointly". In its petition for review

of the Board's order, McAx argues that because there was no formal association and only the individual companies were signatories to the contract, the administrative law judge erred as a matter of law in inferring an intent to act jointly. We disagree. "The signing of individual contracts does not negate the existence of a multi-employer unit". *N. L. R. B. v. Dover Tavern Owners' Association*, 412 F.2d 725, 727 n. 4 (3d Cir. 1969). This rule applies with equal force to the instant case, where the individual members of a multi-employer unit signed a single contract.

been resolved except for a dispute as to an hourly wage increase. Hicks suggested that a mediator be obtained for the next meeting. The following day, however, the representative of Heath and Company requested a special meeting. All parties, with the exception of McAx, agreed to meet on Monday, June 28; Simpson, McAx's president, informed the Union that he could not attend the meeting because he had already made a business commitment for that day. On June 28, in Simpson's absence, the parties agreed to a wage increase of ten cents per hour more than had been agreed to earlier.

On July 2, 1976, in accordance with past practice, Union Business Manager James Foreman mailed to each employer a copy of the changes agreed to. Thereafter, each employer, except for McAx, acknowledged that the changes set forth in Foreman's letter were those agreed to in the negotiations. Hicks telephoned Simpson on July 12, but was unable to reach him. On July 22, Foreman informed Simpson by letter that the rate of pay of journeymen had been changed effective July 1 and asked that McAx comply with the terms of the new contract if it had not done so already.

McAx did not respond to the July 22 letter. Hicks made several additional unsuccessful calls on successive days, leaving his name and telephone number for Simpson to call, but no response was forthcoming. Hicks finally reached Simpson on July 29. At that time, Simpson told Hicks that he had not had a chance to review the changes mailed to him 27 days earlier, but that he would do so and call Hicks the next day. When he did not do so, Hicks hand delivered a copy of the new contract on July 30.

On August 2, Simpson informed the Union in writing that he would not sign the new contract for the stated reason that the hourly wage provisions were contrary to McAx's fiscal interests.

On the basis of these facts, the administrative law judge found a refusal to bargain in violation of the National Labor Relations Act:

> In summary, in light of a bargaining history which was to all outward appearances on a group basis, including the use of an association name, with all the contractors cosigning the same contract, plus the fact that the negotiations revealed a group approach to bargaining, the conclusion is warranted, and I find, that [McAx] had manifested an intention to be bound by group rather than individual action and that its refusal to sign the agreement agreed to by the group on June 28 was a refusal to bargain within the meaning of Section 8(a)(1) and (5) of the Act [29 U.S.C. §§ 158(a)(1) and (a)(5)].[2]

The Board affirmed the findings of the administrative law judge and adopted his recommended order requiring McAx to execute and honor the agreement reached on

---

**2.** Were it not for other language in the administrative law judge's opinion, this finding would present a problem. As we have recently held, the test for determining whether a multi-employer bargaining unit has been established "is whether the employer members of the group have indicated from the outset an *unequivocal* intention to be bound by group action in collective bargaining . . . ." *N. L. R. B. v. Beckham, Inc.,* 564 F.2d 190, 192 (5th Cir. 1977) (emphasis added). In the quoted finding, the administrative law judge omitted the key qualifier "unequivocal", suggesting, at first glance, that he may have applied an erroneous legal standard. But the opinion as a whole makes clear that the judge recognized and applied the correct standard. The analysis section opens with this statement: "Whether [McAx] was obligated to sign that agreement depends on whether or not [McAx] had indicated an *un-*

*equivocal intention* to be bound in collective bargaining by group rather than individual action". In applying the "unequivocal intention" standard, the administrative law judge quoted extensively from the Board's decision in *Joseph McDaniel,* 226 NLRB No. 120, subsequently enforced by this Court *sub nom. N. L. R. B. v. Beckham, Inc., supra.* In *Joseph McDaniel,* the Board held that an "unequivocal intention" could be inferred from "outward manifestations of intent to engage in group bargaining", concluding that "[a]n employer who, through a course of conduct or otherwise, signifies that it has authorized the group to act in its behalf will be bound by that apparent creation of authority". The administrative law judge, we conclude, analyzed the facts of this case under the applicable legal standard. We are satisfied moreover that he did indeed find the requisite talismanic "unequivocal intention".

June 28, 1976, and to make its employees whole for any loss of earnings or other benefits they may have suffered by reason of McAx's refusal to sign.

## II. THE ISSUES RAISED

McAx raises two primary objections to the conclusions of the administrative law judge, both of which are without merit.

First, McAx contends that, in affirming the administrative law judge's finding of an unequivocal intention to be bound by group action, the Board deviated from the legal standard that it announced in *Van Eerden Co.,* 154 NLRB 496, 499 (1965). Hence, it argues, enforcement should be denied under *National Fresh Fruit and Vegetable Co. v. N. L. R. B.,* 565 F.2d 1331, 1336 (5th Cir. 1978) and *N. L. R. B. v. Hi-Way Billboards, Inc.,* 500 F.2d 181, 184 (5th Cir. 1974). In *Van Eerden, Co.,* the Board stated:

When employers have banded together informally to bargain, without expressly documenting their relationship to each other or to the union involved, we have often inferred the presence of the requisite intention from the facts that the employers have participated for a meaningful period of time in joint bargaining negotiations and have adopted substantially uniform contracts resulting therefrom. The ultimate question in these cases, however, is the actual intent of the parties, since multi-employer bargaining is a voluntary arrangement, dependent upon the real consent of the participants to bind themselves to each other for bar-

gaining purposes. And where there is specific evidence, beyond the mere circumstances of joint negotiations and uniformity of contracts, indicating that the parties did not intend to accept the obligations and benefits of multi-employer bargaining, that evidence must be equally considered in determining the basic issue.

■■■ We find no departure from these principles in this case. It is well established that the requisite intent may be inferred from a prior history of multi-employer bargaining and the adoption of uniform contracts. See, e. g., *N. L. R. B. v. Johnson Sheet Metal, Inc.,* 442 F.2d 1056, 1060 (10th Cir. 1971); *N. L. R. B. v. Southwestern Colorado Contractors Ass'n,* 379 F.2d 360, 364 (10th Cir. 1967); *Bennett Stone Co.,* 139 N.L.R.B. 1422 (1962).[3] In this case, the prior dealings of the parties and the course of conduct during the 1976 negotiations amply supported an inference of unequivocal intent to be bound by group action. Furthermore, the administrative law judge did not deviate from the rule of *Van Eerden* that evidence "indicating that the parties did not intend to accept the obligations and benefits of multi-employer bargaining . . must be equally considered in determining the basic issue".[4]

■■ The evidence presented by McAx to negate the inference of unequivocal intention was weighed and rejected by the administrative law judge. McAx argued first that the unilateral decision by three of the four employers to request modification of the 1973 contract on April 30, 1976, is incon-

---

3. Most of the pertinent cases, including *N. L. R. B. v. Beckham, Inc.,* supra, have involved express statements that a group of employers would negotiate as a single unit. Time and again, however, the Board has stated the relevant test in the disjunctive: a multi-employer bargaining unit may be established *either* by "a controlling history of collective bargaining on such basis, *or* an unequivocal agreement of the parties to bind themselves to a course of group bargaining in the future". *Electric Theatre, Inc.,* 156 NLRB 1351, 1352 (1966) (emphasis added). See also *Bennett Stone Co.,* 139 NLRB 1422 (1962). Thus, the absence of a clear expression of intent in this case is no bar to a finding that a multi-employer bargaining unit existed.

4. In its brief, McAx argues that *Van Eerden* controls this case and requires, as a matter of law, a finding that McAx approached the 1976 negotiations on an individual rather than a group basis. In *Van Eerden,* however, there was extensive evidence that all of the employers regarded the negotiations as individual and agreed that none would be bound by group action, that each reserved the right to bargain independently, and that the union representative understood that the employers could terminate the negotiations "at any time". *Van Eerden* is thus clearly distinguishable from the instant case.

sistent with a group approach to bargaining. The administrative law judge found, however, that the subsequent approach to the negotiations as a group, including the preparation of a consolidated employer proposal, negated the inference urged by McAx. McAx also relied upon the fact that Simpson ultimately refused to sign the agreement. In response, the administrative law judge found that McAx's "reasons for rejecting the contract as set forth in its August 2 letter are clearly a belated attempt to avoid the legal consequences of its past conduct". These inferences drawn by the administrative law judge are supported by substantial evidence in the record and may not be disturbed by this Court. See *Universal Camera Corp. v. N. L. R. B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *N. L. R. B. v. Allis-Chalmers Corp.,* 563 F.2d 674 (5th Cir. 1977).

In finding the requisite "unequivocal intention" the administrative law judge noted that, in spite of many opportunities to do so, McAx never expressed an intention *not* to be bound by collective action. We agree that under the facts of this case McAx's failure to reserve the right to dissent supports a clear inference of intent to be bound by group action. Cf. *N. L. R. B. v. Southwestern Colorado Contractors Ass'n, supra,* 379 F.2d at 364.

So far as the record discloses, the first time that McAx took the position that it was not bound by group action was on October 1, 1976, in response to a complaint filed against it by the regional office of the N.L.R.B. pursuant to charges filed by the Union *after* Simpson refused to sign the contract.

Without a single indication to the contrary, the activities of Simpson, McAx's chief executive officer and designated bargaining agent in the ongoing multi-employer contract negotiations with the Union, all point inexorably and inescapably to the conclusion that his belated disclaimer to be bound by the joint negotiations was no more than an afterthought, perhaps as a result of consultation with counsel. Simpson attended and participated in the first six negotiating sessions—on May 18, May 25, June 1, June 8, June 15, and June 22, 1976—without caveat. He did not attend the critical and final session of June 28, 1976, as he explained to Union representative Hicks, because "I made some commitments with out of town people that makes it impossible for me to attend . . ." In the three weeks following the June 28 session, Simpson was twice informed of the terms agreed upon at that session, by letters from Union Business Agent Foreman dated July 2 and 22, 1976; he did not respond to these letters or return any of the repeated telephone calls made to him by Foreman and Hicks. When Hicks was finally able to reach Simpson by telephone on July 29, Simpson stated only that he had not yet had a chance to review the changes.[5] On August 2, in explaining his reasons for refusing to sign the contract, Simpson wrote:

> After long and careful review, we find that to become a party to the agreement in question would seriously impair our opportunity for healthy fiscal operation and would severely restrict our company's future.
>
> For these reasons, I cannot enter into and sign this agreement for McAx Sign Company, Inc.

■ The Board has repeatedly held that withdrawal from a multi-employer bargaining unit is untimely if attempted after the

---

5. We find contrary to our own common experience with mankind, and hence unworthy of belief, Simpson's statement that, although he had the final proposed changes in the labor agreement in his possession for 27 days, he had not on July 29 had an opportunity to review them. The information in the report dealt with the single most critical business concern of this employer for the next three years: the wage scale for its employees. As did the administrative law judge, we view Simpson's statement to Hicks that he had had no opportunity to review the proposed contract changes in the intervening 3–4 week period as not made in good faith and as no more than a bungling attempt to avoid the legal consequences of his prior conduct. If Mr. Simpson had sought legal advice early rather than late, it may be that he would have fared better.

commencement of negotiations. See, e. g., *N. L. R. B. v. Tulsa Sheet Metal Works, Inc.,* 367 F.2d 55, 57 (10th Cir. 1966); *N. L. R. B. v. Sheridan Creations, Inc.,* 357 F.2d 245 (2d Cir. 1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544; *N. L. R. B. v. Sklar,* 316 F.2d 145 (6th Cir. 1963). This rule is intended to minimize disruption of the bargaining process by preventing an employer from using the threat of withdrawal from negotiations as a "bargaining lever". *N. L. R. B. v. Sheridan Creations, Inc., supra,* 357 F.2d at 248. In light of the administrative law judge's findings in this case, to accept McAx's ultimate refusal to sign a collective bargaining agreement not to its liking as proof that it never intended to be bound by group action would thwart the rule governing withdrawal from multi-employer bargaining units.

■ McAx also argues that the Board deviated from the rule that unequivocal intent must be manifested "from the outset", *Joseph McDaniel,* 226 NLRB No. 120, enforced sub nom. *N. L. R. B. v. Beckham, Inc., supra,* because it relied upon evidence that the employers' individual proposals were consolidated *after* negotiations commenced. This argument assumes that the submission of individual proposals before or at the commencement of negotiations is consistent only with an intent to bargain individually, an assumption which we reject. The submission of individual proposals in this case was an ambiguous act because it was not accompanied by any express statement of intent. Its meaning thus had to be inferred from the surrounding circumstances. Here, as the administrative law judge noted, the three individual proposals were made after a history of multi-employer bargaining and served merely as a starting point for an eventual consolidation to facilitate bargaining as a unit. Under these circumstances, the Board was justified in basing its finding of intent from the outset in part upon conduct which occurred during the negotiations.

Substantial evidence in the record supports the finding of both the administrative law judge and the Board that McAx indicated from the outset an unequivocal intention to be bound by group rather than individual action. McAx is thus bound by the contract negotiated by the group.

McAx's petition for review is denied; the order of the National Labor Relations Board is ordered

ENFORCED.

GODBOLD, Circuit Judge, dissenting:

I respectfully dissent.

The ALJ did not find the required *"unequivocal* intention" to be bound by group collective bargaining, and I am not willing to join in patching up his findings at the appellate level to make them meet the correct legal standard. See note 2 of majority opinion and accompanying text. On the thin and equivocal evidence in this case it is pure speculation to assume that the ALJ meant "unequivocal" when he did not say so. Indeed, one could infer that he could not bring himself to make a finding so embarrassingly bereft of support.

The fulcrum of this case is the alleged evidence of a past history of group collective bargaining. First, a multi-employer bargaining unit may be established by unequivocal and express agreement of the parties to bind themselves to group bargaining or by a controlling history of collective bargaining on such basis. See footnote 3 of majority opinion. There being no express agreement, the majority stand on the alternative of "a controlling history of collective bargaining on such basis."

Second, to meet the requirement of unequivocal intent to be bound by group action (based upon circumstances other than express agreement), the majority infer unequivocal intent and base that inference in part upon dealings of the parties prior to 1976.

Third, the unequivocal intent to engage in group bargaining must be manifested from the outset of the negotiations. The 1976 bargaining began with the submission of individual proposals from the various employers. This was not merely equivocal action but affirmatively tended to show

intention not to engage in group bargaining. To get these embarrassing circumstances out of the case the majority lean again upon the reed of the alleged prior history of group bargaining.

Thus the thread of alleged history of prior group bargaining runs all through the case and props it up at every critical juncture. There is no substantial evidence of prior group bargaining. The majority cite none and the ALJ cited none. Rather the ALJ inferred from the single expression "Neon and Electrical Sign Companies of Dallas, Texas," used in past contracts, that the parties thereto had agreed to negotiate jointly in making the past contracts, although the past contracts had been signed by individual employers each designating himself as "Employer." One need not rely on the shibboleth of inference on an inference to see that what has been done here is impermissible. On the basis of the use of a single term, and no other evidence, the Board and the majority have drawn an inference with regard to the nature of unrevealed and undescribed bargaining negotiations conducted in 1968, 1971 and 1973, and then have used this inference to draw the critical inferences described above relating to 1976 negotiations. This attenuated bootstrapping is not substantial evidence.

In *NLRB v. Beckham, Inc.,* 564 F.2d 190 (C.A.5, 1977), a divided Board and a divided panel of this court found sufficient evidence of unequivocal intention to participate in multi-employer bargaining. The flimsiness of the present case is demonstrated by comparing it with the facts which in *Beckham* were held sufficient by two divided review bodies. In *Beckham* the prior bargaining history was proved. Members of the employers' association had bargained with the union as a group but with the purpose of signing individual contracts. Before the contract in issue was negotiated the association amended its bylaws to enable it to act as a multi-employer bargaining unit and negotiate a single contract for its members. At a meeting of the association it was announced that there would be group bargaining for a single contract. All members present including Beckham agreed. Negotiations began and the representative of the employers' association told the union that the association was negotiating for members as a group instead of for individual contracts as in the past. Beckham was present and never indicated disagreement with the statement. The union agreed to negotiate with the association as a multi-employer unit. At the final negotiating session the employers reported that they agreed to the contract except that Beckham needed relief from one provision, and the union stated it would not object to Beckham's getting a waiver from his employees on this provision. Beckham and all others shook hands and stated they had an agreement. After Beckham was unable to get a waiver he took the position he was not bound. In the present case there is no factual evidence of prior bargaining history, no formal employers' association, no evidence that an association even exists except for the descriptive term used in the preceding contracts, no pre-bargaining agreement among employers that the group was negotiating as a unit, no announcement at the meetings that the negotiations were group in nature, no agreement by the union that the negotiations were with employers as a group. The post-bargaining actions of McAx were equivocal, but they do not rise to the level of the implied recognition given by employer Beckham in asking for a waiver.

The Board order should not be enforced.